KATHY BAZOIAN PHELPS (155564)
*kphelps@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone:  (310) 651-2997

Christopher D. Sullivan (148083)
*csullivan@diamondmccarthy.com*
Karen K. Diep (305587)
*kdiep@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Telephone: (415) 692-5200

*Proposed Counsel for Stephen J. Donell,*
*Liquidating Receiver*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:19−cv−04355-SVW-E |
| Plaintiff, | **DECLARATION OF STEPHEN J. DONELL IN SUPPORT OF *EX PARTE* EMERGENCY APPLICATION FOR ORDER AUTHORIZING: (1) EMPLOYMENT OF PHILIP SEYMOUR/KELLER WILLIAMS AS REAL ESTATE BROKER AND APPRAISER; (2) APPOINTMENT OF BRENTWOOD PROPERTY APPRAISAL, INC. AND LIPSEY APPRAISAL SERVICE AS ADDITIONAL APPRAISERS; (3) PRIORITY BORROWING AND ISSUANCE OF RECEIVER'S CERTIFICATES; (4) EMPLOYMENT OF DIAMOND McCARTHY LLP AS GENERAL COUNSEL; AND (5)** |
| v. | |
| ALLIEDWALLET, INC., et al., | |
| Defendants. | |

1

**AUTHORITY TO RETURN
PRORATED MORTGAGE
PAYMENT TO DEFENDANT; AND
FOR ORDER FOR STAY OF
ACTIONS AFFECTING
RECEIVERSHIP PROPERTY**

[No Hearing Set on *Ex Parte* Application]

I, Stephen J. Donell, declare and state:

1.      I am the Court-appointed liquidating receiver (the "Receiver") of (a) the real property located in the city of Los Angeles, county of Los Angeles, state of California, commonly known as 3100 Benedict Canyon Drive, Beverly Hills, California 90210-1033, Parcel Number 4382-001-2023 (the "Benedict Canyon Real Property"), and (b) all furnishings and other personal property purchased for and/or located at the Benedict Canyon Real Property (collectively, the "Receivership Property"), pursuant to the Stipulated Final Order for Permeant Injunction and Monetary Judgment against Ahmad ("Andy") Khawaja, AlliedWallet, Inc., Allied Wallet, Ltd., GTBill, LLC, and GTBill Ltd. issued on June 7, 2019 ("Receiver Order"), Doc. No. 30.   I have personal knowledge of all of the facts in this declaration and, if called as a witness, could competently testify to these facts.

2.      Pursuant to the terms of the Receiver Order, I was appointed as liquidating receiver over the Benedict Canyon Real Property and the related personal property and furnishings purchased for or located at the property, with a duty to market and sell the Receivership Property and file a final report and accounting within six months of the my appointment, unless the deadline is extended.

3.      I have personally inspected the Benedict Canyon Real Property and the personal property located there.   The Benedict Canyon Real Property is a large approximate 12,569 square foot mansion on approximately 1.5 acres (over 65,000

square foot lot) located just below Mulholland Drive in the Beverly Hills Post Office area of luxury homes in Los Angeles, California.

4.     There is no cash or other liquid assets in the receivership estate, which is comprised solely of the real and personal property associated with the Benedict Canyon Real Property.  There is therefore no source of funding to pay for me to pay the maintenance and other essential expenses to preserve the Receivership Property during the time it takes for me to list, market and sell the assets.

5.     I am charged with the duty to preserve and protect the Receivership Property by making repairs, obtaining appropriate insurance, and making required "payments for taxes, insurance, assessments, reasonable and necessary maintenance, and any other actions necessary to efficiently manage the assets and maintain their value." (Receiver Order Section X.C.)

6.     In order to offer the Benedict Canyon Drive Property for sale, I am requesting authority to employ Phil Seymour of Keller Williams as the real estate broker ("Broker") to list, market and solicit offers to maximize value for the Benedict Canyon Drive Property.  I propose employing the Broker subject to the terms of the proposed listing agreement and addendum attached hereto collectively as **Exhibit** "**1**." I believe engaging the Broker, who is a professional who specializes in the marketing and sale of high-end residential properties such as the Benedict Canyon Drive Property as well as acting as sales agent and broker for receivers and other fiduciaries will advance the goals of administrative efficiency and maximizing the purchase price for this asset.  Phil Seymour of Keller Williams specializes in the sale of high-end residential properties like the Benedict Canyon Drive Property and has substantial experience as a sales agent or broker in receiverships, bankruptcy cases and other similar matters, and is, thus, uniquely qualified to serve as the Receiver's real property broker in this matter.

7.     As required for a private sale of real property, I also request the

DECL. OF STEPHEN J. DONELL ISO *EX PARTE* APPLICATION

appointment of three real estate appraisers for the Benedict Canyon Real Property: (1) Phil Seymour of Keller Williams who will provide a realtor's market analysis as permitted under Section X.D.2 of the Receiver Order; (2) Joey Akiba of Brentwood Property Appraisal, Inc.; and (3) Craig Lipsey of Lipsey Appraisal Service (collectively, the "Appraisers").  I have researched and contacted different real estate appraisal firms and have concluded that Joey Akiba and Craig Lipsey and their respective companies are well qualified to provide appraisals of the Benedict Canyon Real Property in this matter.

  8. I also request the Court's authority to employ Diamond McCarthy LLP as my general counsel in this receivership effective June 7, 2019, the date the Receiver Order was entered.  I requested assistance from Diamond McCarthy when the Receiver Order was entered to, among other things: (1) provide legal advice regarding liquidating the assets of the Receivership Estate, including legal advice related to the listing, marketing, sale, and transfer of the Receivership Estate assets to third parties; (2) assist with the negotiation and documentation of any agreements related to the administration, sale or other disposition of the estate, including the Benedict Canyon Real Property and the personal property comprising the Receivership Property, including any purchase and sale agreement(s) and related documents; (3) advise the Receiver regarding, and prepare and file pleadings related to, the employment of the Receiver's real estate broker, the three appraisers to be designated under 28 U.S.C. section 2001(b), the motion for approval of any sale of the Receivership Property and the required procedures for notice and confirmation of any sale of the Receivership Property under 28 U.S.C. sections 2001(b), 2002 and 2004; (4) prepare and file other pleadings required by the Receiver or the Court in connection with his administration of the receivership estate; and (5) provide legal advice regarding the legal issues in the administration of the estate, including on any issues that may arise from necessary repairs,

procuring appropriate insurance, and making required payments for taxes, insurance, assessments, reasonable and necessary maintenance, and any other actions necessary to manage the Receivership Property. Compensation for services by Diamond McCarthy will be subject to Court approval and authorization for payment, upon motion and after notice and an opportunity for hearing.

9.      To the best of my knowledge, the Broker, Diamond McCarthy and the Appraisers and their members do not hold any interest adverse to the receivership estate nor are they connected with any of the parties to this action, myself, or any other party in interest, or their respective attorneys.

10.     I have an urgent and immediate need for funds to be provided under one or more receiver's certificates in the aggregate principal amount of up to $400,000, from SVR Capital Trust as the lender in order to make essential payments in connection with the Property.

11.     To preserve and maintain the Property, I  must: (1) continue making mortgage payments on the Benedict Canyon Real Property of approximately $33,000 per month, of which roughly 50% constitutes a payment of principal, so that the mortgage remains current to avoid a default and any subsequent foreclosure proceedings initiated by Wells Fargo Bank, N.A. ("Wells Fargo"); (2) pay insurance which the Receiver anticipates may be in an annual amount of approximately $35,000 based on residence being vacant; (3) pay monthly payments for the regular maintenance  preservation of the property including utilities, including gas, water and electricity, pool/fountain and landscape maintenance, and alarm system, to protect the property and prevent service interruption during the Broker's marketing efforts; and (4) pay all other related receivership expenses associated with the administration and sale of the Receivership Property, including a lender's title insurance to fund the receiver certificate. I do not intend to use any of the funds borrowed to pay for Receiver's fees or fees of my professionals, which will be paid from the proceeds of

DECL. OF STEPHEN J. DONELL ISO *EX PARTE* APPLICATION

liquidation of the Receivership Property upon Motion and with Court approval.

11.     The estimated budget for property-related expenses is as follows:

| Routine Monthly Expenses | Amount |
|---|---|
| Mortgage payment | $33,229.97 |
| Utilities:<br>*Water, Gas, and Electricity* | $3,500.00 |
| Fountain/Pool maintenance | $775.00 |
| Landscape maintenance, including irrigation, repairs, re-planting, tree trimming | $900.00 |
| Alarm Monitoring/telephone | $300.00 (est.) |
| **Total Monthly Expenses** | **$38,704.97** |

| Other Expenses | Amount |
|---|---|
| Annual Insurance Premium | $39,913.33 |
| Appraisals:<br>*Brentwood Property Appraisal, Inc.*<br>*Lipsey Appraisal Service* | $5,000.00 |
| Re-Key | $750.00 |
| Initial Cleanup | $1,500.00 |
| **Total** | **$47,163.33** |

12.     In addition, I learned on June 20, 2019 in a meeting with the former listing agent for the Benedict Canyon Real Property that there are repairs that may need to be performed on the property in connection with the marketing and sale of the property.  For example, there is a pool leak, and repairs are needed to the irrigation system. I anticipate that I will need to make the repairs to the irrigation system in order to avoid damage or loss of the extensive landscaping on the grounds and to

DECL. OF STEPHEN J. DONELL ISO *EX PARTE* APPLICATION

maintain the appearance of the grounds for marketing purposes.

13.     I have obtained a preliminary title report for the Benedict Canyon Real Property, a true and correct copy of which is attached hereto as **Exhibit "2**."  The title report shows the only lien on the property is the deed of trust of Wells Fargo securing a debt in the original principal sum of $8,250,000.  The only other lien is the senior lien for real property taxes not yet due or assessed.

14.     The loan offered by SVR Capital Trust to the Receivership Estate to be reflected in Receiver's Certificate(s) is to be secured by a first priority lien on the Benedict Canyon Real Property, junior only to the senior lien for accruing real property taxes not yet due or assessed, and senior to the lien of Wells Fargo.  The loan is essential in order to pay the costs and expenses of administering the Receivership Property.   The lender SVR is not willing to loan funds on the basis of a junior lien subordinate to a senior lien of over $8 million, and has only agreed to lend these funds if the loan will be secured by the Benedict Canyon Real Property on the basis of a first priority deed of trust, junior only to accruing real property taxes and the administrative expenses of the receivership.  In my experience over my career as a receiver and in real estate management, lenders providing loans to a receivership estate typically are not willing to loan without a senior lien on assets prior to other existing liens.

15.     The additional terms and conditions of my proposed borrowing are set forth in the form of the Receiver's Certificate.  In summary, advances would bear interest at a rate of 15% per annum and will be due and payable in full within 18 months, with no payments due until maturity.  SVR also requires a fee of 5% (points) of the advanced amount, which is also not due and payable until the 18-month maturity.  Attached hereto collectively as **Exhibit "3"** is a true and correct copy of the proposed form of Receiver's Certificate and deed of trust to secure the Receiver's certificate.

16.     Further, Wells Fargo's interest in the Benedict Canyon Real Property will

---

7

be adequately protected, given that the Benedict Canyon Real Property is being listed for sale for $15 million, and the borrowed funds in part will be used to pay and keep current the monthly mortgage payment of $33,229.97. In addition, half of the monthly mortgage payment (roughly $16,000.00) is a reduction of the loan principal. I believe that Wells Fargo will be fully protected; nevertheless, I am also seeking a blanket stay of any action affecting the Receivership Property to protect the receivership estate may be necessary to avoid any delay regarding the sale of the Property.

17. For the reasons stated above, I respectfully request that this Court authorize me to borrow funds, secured by the Property, in an aggregate amount no more than $400,000.00, to fund one or more Receiver's Certificates. This Application is being served on lienholder Wells Fargo, N.A. to the Property because I am requesting authorization to borrow funds pursuant to Receiver's Certificate.

18. I have met and conferred with Plaintiff Federal Trade Commission ("FTC") through its counsel in the case, and the FTC has advised me that it has no opposition to the relief sought and may join in my application. The only defendant with an interest in the Receivership Property is Ahmad Khawaja who voluntarily turned over the Receivership Property for liquidation under the terms of the Receiver Order and therefore has no interest which will be harmed by the relief sought.

19. Mr. Khawaja has provided me with proof that he paid the monthly payment that is due to Wells Fargo on July 1, 2019 covering the payment with accruing interest for the month of June 2019. He has requested, and I have agreed, subject to Court approval, that I return to him the prorated share of the monthly mortgage payment covering the 23-day period in June after the Receiver Order was entered, which by the terms of the Receiver Order is the financial responsibility of the receivership estate. I have calculated the prorated amount of the monthly payment and request authority to return to defendant Khawaja the amount of $25,476.31 from the funds to be loaned to the estate by SVR. In addition, he seeks reimbursement of

DECL. OF STEPHEN J. DONELL ISO *EX PARTE* APPLICATION

utilities and alarm monitoring and phone charges on a pro-rata basis.

20.     Though I am seeking borrowing authority in order to fund the necessary expenses of the receivership estate for the Receivership Property while I market and sell the property, there is a risk that certain payments for essential services and to Wells Fargo may be delayed pending Court approval of the requests made in the Application and if the borrowing is approved, while the Receiver's Certificate is issued, the deed of trust is recorded and funding becomes available.  In an abundance of caution, and because of the risks to the estate if the Receivership Property is not protected from liens or other actions by creditors and claimants that might be asserted against the Receivership Property by third parties, I am requesting imposition of a blanket injunction to protect the Receivership Property from creditor claims during the liquidation process and receivership.  Creation of liens, attempts to foreclose by Wells Fargo or others if allowed could jeopardize the Receivership Property and the sole assets of the receivership estate, which could result in additional cost and potential loss to the estate.  The blanket stay will merely preserve the *status quo* while I liquidate the assets and should not be detrimental to creditors.  Further, as proposed, any creditor or claimant could seek relief from the blanket stay if they can demonstrate cause to initiate or continue any action against the Receivership Property.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of June, 2019, at Los Angeles, California.



_____

Stephen J. Donell

DECL. OF STEPHEN J. DONELL ISO *EX PARTE* APPLICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1



**CALIFORNIA**
**ASSOCIATION**
**OF REALTORS®**

**RESIDENTIAL LISTING AGREEMENT**
**(Exclusive Authorization and Right to Sell)**
(C.A.R. Form RLA, Revised 12/18)

**Date Prepared:** *06/13/2019*

1. **EXCLUSIVE RIGHT TO SELL:** _____ *Stephen Donell in his sole capacity as Receiver* _____ ("Seller")
   hereby employs and grants _____ *Keller Williams Studio City* _____ ("Broker")
   beginning (date) _____ and ending at 11:59 P.M. on (date) _____ ("Listing Period")
   the exclusive and irrevocable right to sell or exchange the real property described as *3100 Benedict Canyon Dr*
   _____, situated in *Beverly Hills* (City),
   _____ (County), California, *90210-1033* (Zip Code), Assessor's Parcel No. *4382-001-023* ("Property").
   ☐ This Property is a manufactured (mobile) home. See addendum for additional terms.
   ☐ This Property is being sold as part of a probate, conservatorship or guardianship. See addendum for additional terms.

2. **LISTING PRICE AND TERMS:**
   **A.** The listing price shall be: *Fifteen Million*
   _____ Dollars ($ *15,000,000.00* ).
   **B.** Listing Terms: *All cash at close of escrow*
   _____.

3. **COMPENSATION TO BROKER:**
   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Seller and Broker (real estate commissions include all compensation and fees to Broker).**
   **A.** Seller agrees to pay to Broker as compensation for services irrespective of agency relationship(s), either ☒ *3.850* percent of the listing price (or if a purchase agreement is entered into, of the purchase price), or ☐ $ _____, AND _____, as follows:
   **(1)** If during the Listing Period, or any extension, Broker, cooperating broker, Seller or any other person procures a ready, willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the Buyer completes the transaction or is prevented from doing so by Seller. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)
   **OR (2)** If within _____ *60* _____ calendar days (a) after the end of the Listing Period or any extension; or (b) after any cancellation of this Agreement, unless otherwise agreed, Seller enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ("Prospective Buyer") or that person's related entity: (i) who physically entered and was shown the Property during the Listing Period or any extension by Broker or a cooperating broker; or (ii) for whom Broker or any cooperating broker submitted to Seller a signed, written offer to acquire, lease, exchange or obtain an option on the Property. Seller, however, shall have no obligation to Broker under paragraph 3A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given Seller a written notice of the names of such Prospective Buyers.
   **OR (3)** If, without Broker's prior written consent, the Property is withdrawn from sale, conveyed, leased, rented, otherwise transferred, or made unmarketable by a voluntary act of Seller during the Listing Period, or any extension.
   **B.** If completion of the sale is prevented by a party to the transaction other than Seller, then compensation which otherwise would have been earned under paragraph 3A shall be payable only if and when Seller collects damages by suit, arbitration, settlement or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.
   **C.** In addition, Seller agrees to pay Broker: *N/A* _____.
   **D.** Seller has been advised of Broker's policy regarding cooperation with, and the amount of compensation offered to, other brokers.
   **(1)** Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ("MLS") by offering to MLS brokers out of Broker's compensation specified in 3A, either ☒ *2.000* percent of the purchase price, or ☐ $ _____.
   **(2)** Broker is authorized to cooperate with and compensate brokers operating outside the MLS as per Broker's policy.
   **E.** Seller hereby irrevocably assigns to Broker the above compensation from Seller's funds and proceeds in escrow. Broker may submit this Agreement, as instructions to compensate Broker pursuant to paragraph 3A, to any escrow regarding the Property involving Seller and a buyer, Prospective Buyer or other transferee.
   **F. (1)** Seller represents that Seller has not previously entered into a listing agreement with another broker regarding the Property, unless specified as follows: *N/A*
   **(2)** Seller warrants that Seller has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the following individuals or entities: *N/A* _____
   **(3)** If the Property is sold to anyone listed above during the time Seller is obligated to compensate another broker: (i) Broker is not entitled to compensation under this Agreement; and (ii) Broker is not obligated to represent Seller in such transaction.

© 2018, California Association of REALTORS®, Inc.
**RLA REVISED 12/18 (PAGE 1 OF 5)**

Seller's Initials (_____) (_____)

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 1 OF 5)**

Keller Williams Studio City, 4061 Laurel Canyon Blvd Studio City CA 91604                         Phone: 3106129800          Fax: 8184321501          **3100 Benedict**
Philip Seymour                                   Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

**EXHIBIT 1, Page 12**

Property Address: **3100 Benedict Canyon Dr, Beverly Hills, CA  90210-1033**                    Date: **06/13/2019**

**4. A. ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in a real estate purchase agreement, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded, from the purchase price.
**ADDITIONAL ITEMS EXCLUDED:** _____.
**ADDITIONAL ITEMS INCLUDED:** _____.
Seller intends that the above items be excluded or included in offering the Property for sale, but understands that: (i) the purchase agreement supersedes any intention expressed above and will ultimately determine which items are excluded and included in the sale; and (ii) Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the purchase agreement.

**B. (1) Leased Or Not Owned Items:** The following items are leased or not owned by Seller:
☐ Solar power system      ☐ Alarm system      ☐ Propane tank      ☐ Water Softener
☐ Other _____
**(2) Liened Items:** The following items have been financed and a lien has been placed on the Property to secure payment:
☐ Solar power system      ☐ Windows or doors      ☐ Heating/Ventilation/Air conditioning system
☐ Other _____
Seller will provide to Buyer, as part of the sales agreement, copies of lease documents, or other documents obligating Seller to pay for any such leased or liened item.

**5. MULTIPLE LISTING SERVICE:**
**A.** Broker is a participant/subscriber to _____**CLAW**_____ Multiple Listing Service (MLS) and possibly others. Unless otherwise instructed in writing the Property will be listed with the MLS(s) specified above. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. All terms of the transaction, including sales price and financing, if applicable, (i) will be provided to the MLS in which the property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS and (ii) may be provided to the MLS even if the Property was not listed with the MLS. Seller consents to Broker providing a copy of this listing agreement to the MLS if required by the MLS.

---

**BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS; PRESENTING ALL OFFERS**

**WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit listing information to Internet sites that post property listings online.

**EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS.

**CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** Closed or private listing clubs or groups are not the same as the MLS. The MLS referred to above is accessible to all eligible real estate licensees and provides broad exposure for a listed property. Private or closed listing clubs or groups of licensees may have been formed outside the MLS. Private or closed listing clubs or groups are accessible to a more limited number of licensees and generally offer less exposure for listed property. Whether listing property through a closed, private network - and excluding it from the MLS - is advantageous or disadvantageous to a seller, and why, should be discussed with the agent taking the Seller's listing.

**NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

**OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: (a) real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; (b) Information about Seller's Property will not be transmitted from the MLS to various real estate Internet sites that are used by the public to search for property listings; (c) real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

**PRESENTING ALL OFFERS:** Seller understands that Broker must present all offers received for Seller's Property unless Seller gives Broker written instructions to the contrary.

Seller's Initials ( _____ )( _____ )        Broker's/Agent's Initials ( _____ )( _____ )

---

Seller's Initials   ( _____ )   ( _____ )

**RLA REVISED 12/18 (PAGE 2 OF 5)**
**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 2 OF 5)**

Property Address: **3100 Benedict Canyon Dr, Beverly Hills, CA  90210-1033**                          Date: **06/13/2019**

**B.** MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement. Broker will not have to submit this listing to the MLS if, within that time, Broker submits to the MLS an appropriate form signed by Seller.
☐ Seller elects to exclude the Property from the MLS as provided by C.A.R. Form SELM or the local equivalent form.

**C.** MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Seller acknowledges that for any of the below opt-out instructions to be effective, Seller must make them on a separate instruction to Broker signed by Seller. Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:

**(1) Property Availability On The MLS; Address On The MLS:** Seller can instruct Broker to have the MLS not display the Property or the Property address on the Internet. Seller understands that either of these opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.

**(2) Feature Opt-Outs:** Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below. Seller understands (i) that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; (ii) that other Internet sites may or may not have the features set forth herein; and (iii) that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.

**(a) Comments And Reviews:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display.

**(b) Automated Estimate Of Value:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display. ☐ Seller elects to opt out of certain Internet features as provided by C.A.R. Form SELI or the local equivalent form.

~~**6. SELLER REPRESENTATIONS:** Seller represents that, unless otherwise specified in writing, Seller is unaware of: (i) any Notice of~~ Default recorded against the Property; (ii) any delinquent amounts due under any loan secured by or other obligation affecting, the Property; (iii) any bankruptcy, insolvency or similar proceeding affecting the Property; (iv) any litigation, arbitration, administrative action, government investigation or other pending or threatened action that affects or may affect the Property or Seller's ability to transfer it; and (v) any current, pending or proposed special assessments affecting the Property. Seller shall promptly notify Broker ~~in writing if Seller becomes aware of any of these items during the Listing Period or any extension thereof.~~

**7. BROKER'S AND SELLER'S DUTIES:**

**A.** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Seller gives Broker written instructions to the contrary, Broker is authorized, but not required, to (i) order reports and disclosures including those specified in 7C as necessary, (ii) advertise and market the Property by any method and in any medium selected by Broker, including MLS and the Internet, and, to the extent permitted by these media, control the dissemination of the information submitted to any medium; and (iii) disclose to any real estate licensee making an inquiry the receipt of any offers on the Property and the offering price of such offers.

~~**B.** Seller agrees to consider offers presented by Broker, and to act in good faith to accomplish the sale of the Property by, among~~ other things, making the Property available for showing at reasonable times and, subject to paragraph 3F, referring to Broker all inquiries of any party interested in the Property. Seller is responsible for determining at what price to list and sell the Property.

**C.** Investigations and Reports: Seller agrees, within 5 (or ____) Days of the beginning date of this Agreement, to pay for the following pre-sale reports: ☐ Structural Pest Control  ☐ General Property Inspection  ☐ Homeowners Association Documents
☐ Other _____.

**D.** Seller further agrees to ~~indemnify~~, defend and hold Broker harmless from all claims, disputes, litigation, judgments attorney fees and costs arising from any incorrect or incomplete information supplied by Seller, or from any material facts that Seller knows ~~but fails to disclose including dangerous or hidden conditions on the Property.~~

~~**8. DEPOSIT:** Broker is authorized to accept and hold on Seller's behalf any deposits to be applied toward the purchase price.~~

**9. AGENCY RELATIONSHIPS:**

**A. Disclosure:** The Seller acknowledges receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).

**B. Seller Representation:** Broker shall represent Seller in any resulting transaction, except as specified in paragraph 3F.

**C. Possible Dual Agency With Buyer:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Seller and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Seller any election to act as a dual agent representing both Seller and Buyer. If a Buyer is procured directly by Broker or an associate-licensee in Broker's firm, Seller hereby consents to Broker acting as a dual agent for Seller and Buyer. In the event of an exchange, Seller hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Seller understands and agrees that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

Seller's Initials  (_____) (_____)

**RLA REVISED 12/18 (PAGE 3 OF 5)**

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 3 OF 5)**

Property Address: **_3100 Benedict Canyon Dr, Beverly Hills, CA  90210-1033_**  Date: **_06/13/2019_**

**D. Confirmation:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Seller's execution of a purchase agreement.

**E. Potentially Competing Sellers and Buyers:** Seller understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or purchase through Broker, property the same as or similar to Seller's Property. Seller consents to Broker's representation of sellers and buyers of other properties before, during and after the end of this Agreement. Seller acknowledges receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

10. **SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or person, whether  attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of, the interior of the Property.  Seller agrees: (i) to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and (ii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Seller. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Seller (such as "nanny cams" and hidden security cameras). Seller is advised to post notice disclosing the existence of security devices.

11. **PHOTOGRAPHS AND INTERNET ADVERTISING:**

**A.** In order to effectively market the Property for sale it is often necessary to provide photographs, virtual tours and other media to buyers. Seller agrees (or ☐ if checked, does not agree) that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Property ("Images") for static and/or virtual tours of the Property by buyers and others  for use on Broker's website, the MLS, and other marketing materials and sites. Seller acknowledges that once Images are placed on the Internet neither Broker nor Seller has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Seller further assigns any rights in all Images to the Broker and agrees that such Images are the property of Broker and that Broker may use such Images for advertising, including post sale and for Broker's business in the future.

**B.** Seller acknowledges that prospective buyers and/or other persons coming onto the property may take photographs, videos or other images of the property. Seller understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. (If checked ) ☐ Seller instructs Broker to publish in the MLS that taking of Images is limited to those persons preparing Appraisal or Inspection reports. Seller acknowledges that unauthorized persons may take images who do not have access to or have not read any limiting instruction in the MLS or who take images regardless of any limiting instruction in the MLS. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Seller has control over who views such Images nor what use viewers may make of the Images.

12. **KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors, and accompanied prospective buyers. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism or damage attributed to the use of a keysafe/lockbox. Seller does (or if checked ☐ does not) authorize Broker to install a keysafe/lockbox. If Seller does not occupy the Property, Seller shall be responsible for obtaining occupant(s)' written permission for use of a keysafe/lockbox (C.A.R. Form KLA).

13. **SIGN:** Seller does (or if checked ☐ does not) authorize Broker to install a FOR SALE/SOLD sign on the Property.

14. **EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

15. **ATTORNEY FEES:** In any action, proceeding or arbitration between Seller and Broker to enforce the compensation  provisions of this Agreement, the prevailing Seller or Broker shall be entitled to reasonable attorney fees and costs from the non-prevailing Seller or Broker, except as provided in paragraph 19A.

16. **ADDITIONAL TERMS:** ☐ REO Advisory Listing (C.A.R. Form REOL) ☐ Short Sale Information and Advisory (C.A.R. Form SSIA) ☐ Trust Advisory (C.A.R. Form TA)
☐ Seller intends to include a contingency to purchase a replacement property as part of any resulting transaction
_Re. Para 12: Broker to be present for all showings and will have possession of keys and security code for entry._
_Re. Para 19 (b)(c): shall be superseded by Receivers Addendum (see attached)._
_If broker represents the Buyer in the purchase the total commission shall be 2.5% of the purchase price._

~~17. **MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Agreement, in writing, within 5 Days After its execution.~~

~~18. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon Seller and Seller's successors and assigns.~~

19. **DISPUTE RESOLUTION:**

**A. MEDIATION:** Seller and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. **Exclusions from this mediation agreement are specified in paragraph 19B.**

Seller's Initials  (            ) (            )

RLA REVISED 12/18 (PAGE 4 OF 5)

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 4 OF 5)**

EXHIBIT 1, Page 15

Property Address: **3100 Benedict Canyon Dr, Beverly Hills, CA  90210-1033**                                    Date: **06/13/2019**

B. **ADDITIONAL MEDIATION TERMS:** The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.

C. **ADVISORY:** If Seller and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).

20. **ENTIRE AGREEMENT:** All prior discussions, negotiations and agreements between the parties concerning the subject matter of this Agreement are superseded by this Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Agreement and any supplement, addendum or modification, including any photocopy or facsimile, may be executed in counterparts.

21. **OWNERSHIP, TITLE AND AUTHORITY:** Seller warrants that: (i) Seller is the owner of the Property; (ii) no other persons or entities have title to the Property; and (iii) Seller has the authority to both execute this Agreement and sell the Property. Exceptions to ownership, title and authority are as follows:**See Receivership Addendum**

☐ REPRESENTATIVE CAPACITY: This Listing Agreement is being signed for Seller by an individual acting in a Representative Capacity as specified in the attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. Seller (i) represents that the entity for which the individual is signing  already exists and (ii) shall Deliver to Broker, within 3 Days After Execution of this Agreement, evidence of authority to act (such as but not limited to: applicable trust document, or portion thereof, letters testamentary, court order, power of attorney, resolution, or formation documents of the business entity).

**By signing below, Seller acknowledges that Seller has read, understands, received a copy of and agrees to the terms of this Agreement.**

Seller _____   *Stephen Donell in his sole capacity as* Date _____
        *Stephen Donell in his sole capacity as Receiver*
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Seller _____ Date _____

Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

Real Estate Broker (Firm) **Keller Williams Studio City** _____ DRE Lic. # **01428774** _____
Address **4061 Laurel Canyon Blvd** _____ City **Studio City** _____ State **CA** ___ Zip **91604**

By _____ Tel.**(310)612-9800** E-mail **phil@theseymourgroup.net** DRE Lic.#**00630158** Date _____
      **Philip Seymour**
By _____ Tel._____ E-mail _____ DRE Lic.#_____ Date _____

☐ Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 1991-2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

RLA REVISED 12/18 (PAGE 5 OF 5)
**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 5 OF 5)**





# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
### (Seller's Brokerage Firm to Seller)
### (As required by the Civil Code)
### (C.A.R. Form AD, Revised 12/18)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**
A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)  A duty of honest and fair dealing and good faith.
    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**
A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)  A duty of honest and fair dealing and good faith.
    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING SELLER AND BUYER**
A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a)  A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b)  Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**
Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant _____ Date _____
                          *Stephen Donell in his sole capacity as Receiver*

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date _____

Agent _____ *Keller Williams Studio City* _____ DRE Lic. # *01428774*
                        Real Estate Broker (Firm)
By _____ DRE Lic. # *00630158* _____ Date _____
    (Salesperson or Broker-Associate, if any) *Philip Seymour*

© 1991-2018, California Association of REALTORS®, Inc.

**AD REVISED 12/18 (PAGE 1 OF 2)**
### DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)

**EXHIBIT 1, Page 17**

**CIVIL CODE SECTIONS 2079.13 – 2079.24 (2079.16 APPEARS ON THE FRONT)**

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings: **(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation.**(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

2079.14. A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgment of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

2079.15. In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17(a) As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION: The following agency relationships are confirmed for this transaction:

Seller's Brokerage Firm _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____

Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)

Seller's Agent _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____

Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

Buyer's Brokerage Firm _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____

Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)

Buyer's Agent _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____

Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

2079.18 (Repealed pursuant to AB-1289)

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 **(a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 1991-2018, California Association of REALTORS®, Inc.

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.



Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**AD REVISED 12/18 (PAGE 2 OF 2)**

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**



CALIFORNIA
ASSOCIATION
OF REALTORS®

**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER
OR SELLER - DISCLOSURE AND CONSENT**
(C.A.R. Form PRBS, Revised 12/18)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the seller's willingness to accept a price less than the listing price or the buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller - Disclosure and Consent and agrees to the agency possibilities disclosed.**

| | | |
|---|---|---|
| Seller _____ *Stephen Donell in his sole capacity as Receiver* | Date _____ |
| Seller _____ | Date _____ |
| Buyer _____ | Date _____ |
| Buyer _____ | Date _____ |
| Buyer's Brokerage Firm _____ | DRE Lic # _____ | Date _____ |
| By _____ | DRE Lic # _____ | Date _____ |
| Seller's Brokerage Firm *Keller Williams Studio City* | DRE Lic # *01428774* | Date _____ |
| By _____ | DRE Lic # *00630158* | Date _____ |
| *Philip Seymour* | | |

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

| | |
|---|---|
| **R E B S** | Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020 |



EQUAL HOUSING
OPPORTUNITY

**PRBS REVISED 12/18 (PAGE 1 OF 1)**
**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)**



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

### WIRE FRAUD AND ELECTRONIC FUNDS
### TRANSFER ADVISORY
(C.A.R. Form WFA, Revised 12/17)

Property Address: ***3100 Benedict Canyon Dr, Beverly Hills, CA 90210-1033*** _____ ("Property").

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFERS ADVISORY:

The ability to communicate and conduct business electronically is a convenience and reality in nearly all parts of our lives. At the same time, it has provided hackers and scammers new opportunities for their criminal activity. Many businesses have been victimized and the real estate business is no exception.

While wiring or electronically transferring funds is a welcome convenience, we all need to exercise extreme caution. Emails attempting to induce fraudulent wire transfers have been received and have appeared to be legitimate. Reports indicate that some hackers have been able to intercept emailed transfer instructions, obtain account information and, by altering some of the data, redirect the funds to a different account. It also appears that some hackers were able to provide false phone numbers for verifying the wiring or funds transfer instructions. In those cases, the victim called the number provided to confirm the instructions, and then unwittingly authorized a transfer to somewhere or someone other than the intended recipient.

## ACCORDINGLY, YOU ARE ADVISED:

1. **Obtain phone numbers and account numbers only from Escrow Officers, Property Managers, or Landlords at the beginning of the transaction.**
2. **DO NOT EVER WIRE OR ELECTRONICALLY TRANSFER FUNDS PRIOR TO CALLING TO CONFIRM THE TRANSFER INSTRUCTIONS. ONLY USE A PHONE NUMBER YOU WERE PROVIDED PREVIOUSLY. Do not use any different phone number or account number included in any emailed transfer instructions.**
3. **Orally confirm the transfer instruction is legitimate and confirm the bank routing number, account numbers and other codes before taking steps to transfer the funds.**
4. **Avoid sending personal information in emails or texts. Provide such information in person or over the telephone directly to the Escrow Officer, Property Manager, or Landlord.**
5. **Take steps to secure the system you are using with your email account. These steps include creating strong passwords, using secure WiFi, and not using free services.**

If you believe you have received questionable or suspicious wire or funds transfer instructions, immediately notify your bank, and the other party, and the Escrow Office, Landlord, or Property Manager. The sources below, as well as others, can also provide information:

Federal Bureau of Investigation: https://www.fbi.gov/; the FBI's IC3 at www.ic3.gov; or 310-477-6565

National White Collar Crime Center: http://www.nw3c.org/

On Guard Online: https://www.onguardonline.gov/

**NOTE: There are existing alternatives to electronic and wired fund transfers such as cashier's checks. By signing below, the undersigned acknowledge that each has read, understands and has received a copy of this Wire Fraud and Electronic Funds Transfer Advisory.**

| | | |
|---|---|---|
| Buyer/Tenant | _____ | Date _____ |
| Buyer/Tenant | _____ | Date _____ |
| Seller/Landlord | _____*Stephen Donell in his sole capacity as Receiver* | Date _____ |
| Seller/Landlord | _____ | Date _____ |

©2016-2017, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**WFA REVISED 12/17 (PAGE 1 OF 1)**

EQUAL HOUSING
OPPORTUNITY

**WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY (WFA PAGE 1 OF 1)**

| | | | |
|---|---|---|---|
| Keller Williams Studio City, 4061 Laurel Canyon Blvd Studio City CA 91604 | Phone: 3106129800 | Fax: 8184321501 | 3100 Benedict |
| Philip Seymour | Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com | | |



**EXHIBIT 1, Page 20**

## ADDENDUM TO
## EXCLUSIVE AUTHORIZATION TO SELL

THIS ADDENDUM TO RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE AUTHORIZATION AND RIGHT TO SELL (this "Addendum") is made and entered into by and between STEPHEN J. DONELL, solely in his capacity as court-appointed Receiver ("Receiver") pursuant to that certain Stipulated Final Order for Permanent Injunction and Monetary Judgment Against Ahmad Khawaja, AlliedWallet, Inc., Allied Wallet, LTD., GTBill, LLC and GTBill LTD. entered on June 6, 2019 and attached hereto as Exhibit A (the "Order") in the action styled  Federal Trade Commission vs. AlliedWallet, Inc., et al., United States District Court for the Central District of California (the "Court") as Case No. 2:19-CV-4355-SVW-E and KELLER WILLIAMS STUDIO CITY ("Broker"), as of the date set forth on the last page of that certain Residential Listing Agreement and Exclusive Authorization and Right to Sell (the "Authorization") to which this Addendum is attached and incorporated.

1.      Addendum.  The terms, covenants, and conditions set forth herein are intended to and shall have the same force and effect as if set forth at length in the body of the Authorization. In the event of conflicting terms and conditions between this Addendum and the Authorization, this Addendum shall apply.  All capitalized terms when used herein shall have the same meanings given such terms in the Authorization unless expressly superseded by the terms of this Addendum.

2.      General Duties.  Broker agrees to actively market the Property actively, diligently and continuously, at its sole cost and expense in a first class manner using Broker's best efforts and in accordance with the conditions of sale set forth in Section 5 below, as the same may be reasonably modified by Receiver from time to time in Receiver's reasonable, sole and absolute discretion.  Broker shall show the Property to prospective purchasers, respond to prospective purchasers' questions and inquiries about the Property, and take other customary steps reasonably required to market actively, diligently and continuously the Property.  Broker shall timely submit to Receiver for Receiver's consideration all written offers with respect to the Property.

a.      Compliance with Laws.    In performing its obligations under the Authorization (as amended by this Addendum), Broker shall be responsible for full and timely compliance with all applicable legal and governmental requirements governing Broker's solicitation of purchasers for, and Broker's negotiations and sale of, the Property.

b.      Forms.  Broker agrees to exclusively use forms for agreements to purchase and sell and other forms prescribed by Receiver which shall be provided to Broker by Receiver.

3.      Broker's Authority.

a.      Limitation on Authority.  Broker shall have no authority to (i) commit Receiver to any sale of all or a portion of the Property; (ii) provide information concerning the Property which has not been previously approved by Receiver; (iii) make unsubstantiated statements, representations or warranties about the Property; or (iv) act in any capacity other than as set forth in the Authorization (as amended by this Addendum) in connection with the sale of the Property.

1

b.     Receiver's Approval Rights.   Receiver reserves the right, in his sole discretion, to (i) reject any and all proposals or offers to purchase the Property, and (ii) deal directly with any prospective purchaser of the Property.  Broker acknowledges that any sale of the Property, whether or not in accordance with the conditions of sale set forth in Section 5 below, is subject to the approval of Receiver and the Court, and Receiver (and the Court, as the case may be) may, in its sole discretion, approve or reject such sale or any of the terms thereof.

c.     Dual Representation.  Receiver acknowledges that Broker in some cases may represent prospective purchasers.  Receiver desires that the Property be presented to such persons or entities and consents to the dual representation created thereby.  Broker acknowledges that it owes a fiduciary duty to Receiver in connection with its representation hereunder.  Broker shall not disclose the confidential information of one principal to the other.  Broker agrees to disclose to Receiver, at the earliest possible time, any such dual representation applicable to or affecting any offer to purchase or lease any of the Property.

4.     Termination Date.  The Listing Period shall end at 11:59 P.M. on the date (the "Termination Date") which is the earlier of (i) the closing of the sale of the Property, (ii) the Receivership Termination Date (as defined below), (iii) the date Broker ceases to be licensed as a real estate agent or broker, (iv) in the event of foreclosure of the Property or any part thereof or the delivery of a deed in lieu thereof; or (v) the Early Termination Date (as defined below).  As used herein, the "Receivership Termination Date" shall mean the date that the Receiver is discharged, terminated, or otherwise relieved of his duties by the Court, for whatever reason.  Receiver shall have the option to terminate the Authorization (as amended by this Addendum) at any time during the Listing Period by delivering written notice (the "Early Termination Notice") of Receiver's exercise of such option to Broker specifying the date upon which Receiver desires to terminate the Authorization, as amended by this Addendum (the "Early Termination Date"), which Early Termination Date must be at least thirty (30) days after the date such Early Termination Notice is received by Broker, and in connection therewith, no liability or obligations shall accrue to the Receivership estate or to Receiver, either personally or in his capacity as Receiver, as a result of any such termination of the Authorization (as amended by this Addendum).

5.     Conditions of Sale.  Any sale of the Property shall be subject to the following terms and conditions, unless such terms and conditions are modified in any letter of intent, purchase agreement and/or escrow instructions executed by Receiver and Purchaser:

a.     Receiver is selling the Property in his capacity as Receiver of the Receivership estate, and not in his personal capacity, and no liability or obligations shall accrue to him personally as a result of any sale;

b.     If for any reason, or no reason whatsoever, the Receiver is unable to deliver possession or title to the Property to any potential purchaser, the purchase and sale agreement will direct that purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property; Broker shall have no claim against Receiver in this instance;

**EXHIBIT 1, Page 22**

c.      Receiver is selling the Property in an "AS IS" condition or basis without any representations or warranties whatsoever, including without limitation, representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, ownership, physical condition, compliance with any city, State of California or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the Property; notwithstanding the foregoing Receiver shall endeavor to disclose, to the best of his ability, all material facts known to him on or before the date of sale;

d.      Receiver is exempt from all disclosure requirements regarding the Property in accordance with Civil Code Section §1102.2;

e.      The sale of the Property is subject to approval by the Court after notice to the parties to the Action, and other parties in interest as required by the Court and the applicable Local Court Rules.  The sale may also be subject to overbid;

f.      The purchaser shall, at the purchaser's sole expense, acquire any and all insurance policies that the purchaser desires to cover the Property.  Receiver does not agree to acquire or transfer any insurance policies to the purchaser;

g.      The purchaser is to arrange for all financing, if any, of the acquisition of the Property before the close of escrow;

h.      The Receiver is not required, but may elect, to deliver to the purchaser a written statement of compliance with any applicable state and local law;

i.      Any sale is subject to the following conditions being satisfied before the close of escrow;

(1)      Receiver must prevail with respect to any objections to the proposed sale; and

(2)      Receiver reserves the right to reject any and all offers which in his reasonable business discretion are insufficient.

j.      The Property is being sold subject to:

(1)      All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow;

(2)      The lien of supplemental taxes, if any, assessed pursuant to local and state provisions; and

(3)      Any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property.  Title, however, is to be transferred free of secured claims of record via a Receiver's deed.

**EXHIBIT 1, Page 23**

6.      Payment of Commission.  Subject to the provisions of this Section 6, if during the Listing Period, Receiver sells the Property to a purchaser procured by Broker, Receiver or anyone else, Receiver agrees to authorize the escrow holder to pay Broker the Commission via wire transfer through escrow so long as Broker is not then in default under any material obligation, covenant or condition of the Authorization (as amended by this Addendum). Notwithstanding the forgoing, no Commission shall be considered as earned, due or payable unless and until the full amount of the purchase price for the Property (as set forth in the purchase agreement executed by Receiver and any buyer) is paid to the Receivership estate established pursuant to the Order in good funds and a deed is delivered to and accepted by any buyer (as evidenced by the recording thereof).   Notwithstanding anything to the contrary contained in the Authorization (as amended by this Addendum), neither the Commission or any other commission shall be earned, due or payable in connection with a sale or transfer arising out of either any foreclosure or deed in lieu thereof or any condemnation, eminent domain or any similar proceedings.  For purposes of this Section 6, "good funds" means cash money in U.S. dollars or credits to or for the account of payee immediately available to the payee.  If said purchase price is not so paid, or if said deed is not so delivered to and accepted by any buyer, for any cause or reason whatsoever, including, without limitation, the unmarketability of title, or the failure to perform under the purchase agreement by either Receiver or any buyer, the Commission is not to be considered as earned, due or payable, and Broker shall have no claim whatsoever against Receiver for the Commission, or other commission, in connection with the Authorization (as amended by this Addendum) or the Property.  Additionally, no Commission shall be due and payable if Receiver sells the Property to any non-registered buyer after the expiration or earlier termination of the Listing Period. In no event shall Receiver be obligated to any party other than Broker for the payment of any commission or fee in connection with the sale of the Property during the Listing Period.  Notwithstanding anything to the contrary in the Authorization (as amended by this Addendum), the Commission is subject to approval by the Court, upon motion or request for payment by the Receiver.

7.      Insurance.  During the Listing Period, Broker, at its sole cost and expense, shall carry and maintain the insurance coverage set forth in (1) Exhibit B attached hereto (Workers' Compensation Insurance), (2) Exhibit C attached hereto (Commercial General Liability Insurance), and (3) Exhibit D attached hereto (Errors and Omissions Insurance).  Broker agrees to procure the addition of Receiver as an additional named insured (with an appropriate cross-liability or severability of interest endorsement) to the insurance policy set forth in Exhibit C attached hereto; provided, however, Receiver shall reimburse Broker for any actual, reasonable out-of-pocket costs incurred by Broker in connection with adding Receiver as an additional named insured to such insurance policy.  If the company writing said insurance policies delivers to Broker written notice of any cancellation, material reduction or other modification of coverage, Broker shall promptly deliver to Receiver a copy of such notice after Broker's receipt thereof.

8.      Broker's Representations and Warranties.

a.      Authority.  Broker was and is duly organized, validly existing, and in good standing under the laws of the State of its formation or incorporation, and has complied with, and shall comply with, all applicable laws in order to conduct business in the State or States where the Property is located and where the services are performed.  Broker has the authority to

execute, deliver and perform its obligations under the Authorization (as amended by this Addendum).

          b.      <u>Resources</u>.  Broker has sufficient staff and other resources to carry out Broker's duties hereunder in a prompt, efficient, diligent, and professional manner.

          c.      <u>Licenses</u>.  Broker and all of Broker's other real estate brokers or salespersons engaged to perform services in connection with the Property and the Authorization (as amended by this Addendum) have or will obtain all licenses and permits, and will be licensed to do business in the State in which the Property is located, as is necessary to legally and validly execute and deliver the Authorization (as amended by this Addendum) and perform Broker's obligations under the Authorization (as amended by this Addendum).  Broker shall maintain all required licenses and permits in full force and effect during the Listing Period.

          d.      <u>No Representations to Third Parties</u>.  Broker shall make no representations or warranties to third parties with regard to the Property or the accuracy or completeness of any information concerning the Property obtained from Receiver or any other source, unless Receiver authorizes it to do so.

     9.      <u>Notices</u>.  Any notice in the Authorization (as amended by this Addendum) provided or permitted to be given, made, or accepted by either party to the other must be in writing and shall be deemed given or served in accordance with the provisions of the Authorization (as amended by this Addendum) when delivered or mailed as follows:  notices shall be personally delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, or delivered to a courier who guarantees overnight delivery, properly addressed as follows:

                   TO RECEIVER:

                   Stephen J. Donell, Receiver
                   12121 Wilshire Boulevard
                   Suite 1120
                   Los Angeles, CA 90025

                   TO BROKER

                   Keller Williams Studio City
                   4061 Laurel Canyon Blvd.
                   Studio City, CA 91604
                   Attn: Phil Seymour
                   Email: phil@theseymourgroup.net

     Each such notice or communication shall be deemed to have been given to or served upon the party to which addressed on the date the same is delivered, if personally delivered, or on the date after it is deposited with a courier service guaranteeing overnight delivery or two (2) business days after deposit in the United States registered or certified mail, return receipt requested, postage prepaid, properly addressed in the manner above provided.  Each such

**EXHIBIT 1, Page 25**

delivered notice or communication shall be deemed to have been given to or served upon the party to whom delivered upon the delivery thereof in the manner above provided.  Any party hereto may change its address for the service of notice hereunder by delivering written notice of said change to the other parties hereunder, in the manner above specified, at least ten (10) days prior to the effective date of said change.

10.     Assignment.  The Authorization (as amended by this Addendum) shall be binding upon the parties hereto, their legal representatives, successors, and assigns, and may not be assigned or delegated by Broker, provided that Broker may engage the services of licensed brokers and salespersons employed by Broker to perform services under the Authorization (as amended by this Addendum) subject to Receiver's prior written approval, so long as Broker retains full responsibility and liability for the performance of the representations, covenants and obligations under the Authorization (as amended by this Addendum).   Any unauthorized assignment shall be null and void, and shall not in any event release Broker from any liabilities hereunder.

11.     Indemnification.   Broker shall and does hereby agree to indemnify, defend, protect, and hold harmless Receiver, his partners, officers, employees, agents, property managers, attorneys, successors, and assigns (collectively, the "Indemnified Parties") from and against all demands, liabilities, causes of action, judgments, costs, claims, losses, and expenses, or any combination thereof, including, without limitation, attorneys' fees ("Liabilities"), arising out of; caused by, or resulting from (i) the negligence of, or wrongful acts or omissions of, or failure to comply with the terms of the Authorization (as amended by this Addendum) by Broker, its officers, partners, agents, employees, representatives, salespersons, personnel, staff members, independent contractors, successors, and assigns (collectively, the "Broker Parties"), or (ii) any claim for a commission or other compensation by any other real estate broker or finder working with or for Broker in connection with a sale of the Property which claim is a result of Broker's acts or omissions unless Receiver authorized such commission or other compensation to such other real estate broker or finder in writing.  Notwithstanding the foregoing, Broker's indemnity of Receiver hereinabove shall not apply to any Liabilities to the extent resulting from the gross negligence or willful misconduct of Receiver or the Indemnified Parties.

12.     Exculpation.  It is expressly understood and agreed that notwithstanding anything in the Authorization (as amended by this Addendum) to the contrary, the liability of Receiver under the Authorization (as amended by this Addendum) and any recourse by Broker against Receiver shall be limited solely and exclusively to the interest of Receiver in and to the Property, and neither Receiver, nor any of its constituent partners, shareholders, officers, directors and employees shall have any personal liability therefor and Broker hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Broker.

13.     Entire Agreement.  This Addendum and the Authorization to the extent that such Authorization is not contrary to the terms and conditions herein, constitute the entire contract between the parties.   All prior agreements between the parties are incorporated into the Authorization and this Addendum.  Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.  If any provision of the

Authorization (as amended by this Addendum) is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect.

14.    Court Jurisdiction.  The (Receivership) Court shall have exclusive jurisdiction to resolve any and all disputes relating to the Authorization (as amended by this Addendum), sitting without a jury, which is specifically waived by both parties.

15.    Attorneys' Fees.  In any reference, action, proceeding, or arbitration between Receiver and Broker regarding the obligation to pay compensation or otherwise enforce any obligations or rights arising under or in connection with the Authorization (as amended by this Addendum), the prevailing Receiver or Broker shall be entitled to reasonable attorneys' fees and costs and other appropriate relief.

16.    Employment.  Broker and its agents shall act as the real estate broker for the Receiver only with respect to the marketing and sale of the Property, and Broker's authority shall be derived wholly from the Authorization (as amended by this Addendum), and Broker has no authority to act for or represent Receiver except as specified in the Authorization (as amended by this Addendum).  All prior discussions, negotiations, and agreements between the parties concerning the subject matter of the Authorization (as amended by this Addendum) are superseded by the Authorization (as amended by this Addendum), which constitutes the entire contract and a complete and exclusive expression of their agreement and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.

17.    Independent Contractor.  The relationship of Broker to Receiver shall be and remain that of independent contractor.  Neither Broker nor any agent, employee, servant, or subcontractor of Broker shall be or shall be deemed to be the agent, employee, servant, or subcontractor to Receiver, except as expressly provided herein.  Receiver shall not withhold taxes for Broker or any individuals associated with Broker, and Broker shall be solely responsible therefor.  All reporting of income received by Broker pursuant to the Authorization (as amended by this Addendum) for federal or state tax purposes shall be the sole responsibility of Broker, and Receiver shall have no responsibility to prepare W-2 forms.  Nothing contained in the Authorization (as amended by this Addendum) shall be deemed or construed to create a partnership or joint venture between Receiver and Broker or to cause either party to be responsible in any way for the debts or obligations of the other or of any other party.  Any action taken by Broker which is not permitted by and pursuant to the provisions of the Authorization (as amended by this Addendum and/or any letter of intent, purchase agreement and/or escrow instructions executed by Receiver and Purchaser) shall not bind Receiver.

18.    Receiver.  Although Receiver is not acting as a Broker in this transaction, all parties understand that Receiver is a licensed California Real Estate Broker.

19.    No Implied Waivers/Remedies.  No failure or delay on the part of either party in exercising any right, privilege, power, or remedy under the Authorization (as amended by this Addendum), and no course of dealing between the Broker and Receiver shall operate as a waiver of any such right, privilege, power or remedy; nor shall any single or partial exercise of any right, privilege, power, or remedy under the Authorization (as amended by this Addendum) preclude any other or further exercise of such right, privilege, power, or remedy.  No waiver

shall be asserted against any party hereto unless signed in writing by such party.  The rights, privileges, powers, and remedies available to the parties hereto are cumulative and not exclusive of any other rights, privileges, powers, or remedies provided by statute, at law, in equity, or otherwise.  Except as provided in the Authorization (as amended by this Addendum), no notice to or demand on either party in any case shall entitle such party to any other or further notice or demand in any similar or other circumstances or constitute a waiver of the right of the party giving such notices or making such demand to take any other or further action in any circumstances without notice or demand.

20.    <u>Waiver of Lien Rights</u>.   Broker hereby waives any rights afforded under applicable law to lien the Property, or any portion thereof or any interest therein, for amounts payable under the Authorization (as amended by this Addendum); its sole and exclusive remedy shall be against the Receivership estate by and through the (Receivership) Court.

21.    <u>Governing Law</u>.   The Authorization (as amended by this Addendum) and the rights and remedies of the parties thereunder shall be governed by the laws of the State of California.

22.    <u>Counterparts; Facsimile</u>.   This Addendum may be executed and delivered in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  However, this Addendum shall not be binding on any party until all parties have executed this document, either all on one document or in counterparts.  Facsimile signatures and photocopies of signatures shall be operative as originals.

RECEIVER:                                      BROKER:

By: _____        By: _____
Stephen J. Donell solely in his capacity as    Phil Seymour
court-appointed Receiver pursuant to the Order  Keller Williams Studio City
in the Action currently pending in the United
States District Court for the Central District of
California as Case No. 2:19-CV-4355-SVW-E

Date:                                          Date:

## **EXHIBIT A**

[Attached].

# **EXHIBIT B**

[Attached].

**<u>EXHIBIT C</u>**

EXHIBIT C
-1-

**EXHIBIT 1, Page 31**

**<u>EXHIBIT D</u>**

# EXHIBIT 2

# Fidelity National Title Company
5000 Van Nuys Blvd., Suite 500, Sherman Oaks, CA 91403
Phone: (818) 881-7700

Issuing Policies of Fidelity National Title Insurance Company

ORDER NO.: **00225973-994-VNO-RR1**

LOAN NO.:

Escrow Officer: Van Nuys Title Only EO
Title Officer: Ruben Rosas
Phone: (818) 758-6804
Fax: (818) 475-5185
Email: team.ruben@fnf.com

Fed Receiver Inc.
12121 Wilshire Blvd, Suite 1120
Los Angeles, CA 90025

ATTN:          Stephen Donell
YOUR REF:

PROPERTY:     **3100 Benedict Canyon Drive, Beverly Hills, CA**

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Fidelity National Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Fidelity National Title Insurance Company, a Florida corporation.*

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

Countersigned by:

*Cindy Fried*

Authorized Signature

**Fidelity National Title Company**
5000 Van Nuys Blvd., Suite 500, Sherman Oaks, CA 91403
Phone:  (818) 881-7800

# PRELIMINARY REPORT

---

**EFFECTIVE DATE:**                **May 28, 2019 at 7:30 a.m.**

**ORDER NO.:  00225973-994-VNO-RR1**

The form of policy or policies of title insurance contemplated by this report is:

      **ALTA Extended Loan Policy (6-17-06)**

1.     THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

      **A FEE AS TO PARCEL(S) 1; AN EASEMENT(S) MORE FULLY DESCRIBED BELOW AS TO PARCEL 2.**

2.     TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

      **Ahmad Khawaja, a married man as his sole and separate property**

3.     THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

      **See Exhibit A attached hereto and made a part hereof.**

# EXHIBIT A

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL NO. 1:

THAT PORTION OF FRACTIONAL SECTION 34, TOWNSHIP 1 NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA. ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 3, 1897. DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34. DISTANT THEREON SOUTH 86° 19' 39" EAST 480.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY BOUNDARY WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE. 50 FEET WIDE. AS DESCRIBED IN DEED TO THE CITY OF LOS ANGELES. RECORDED FEBRUARY 6. 1933 AS INSTRUMENT NO. 732, IN BOOK 12076 PAGE 35 OFFICIAL RECORDS. IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 1° 47' 02" WEST 724.93 FEET: THENCE SOUTH 73° 11' 21" EAST 50.00 FEET; THENCE SOUTH 59° 48' 53" WEST 254.74 FEET; THENCE NORTH 43° 121' 02" WEST 200.25 FEET; THENCE NORTH 11° 57' 02" WEST 6.81 FEET TO THE TRUE POINT OF BEGINNING: THENCE SOUTH 39° 12' 54" EAST 147.75 FEET; THENCE NORTH 0° 47' 05" EAST 75.32 FEET: THENCE NORTH 39° 12' 54" WEST 155.00 FEET; THENCE NORTH 11 ° 57' 02" WEST 40.55 FEET. THENCE NORTH 81° 02' 32" WEST 226.52 FEET TO A POINT DISTANT NORTHEASTERLY ALONG AS CURVE IN SAID EASTERLY LINE. CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 215.10 FEET. DISTANT OF 43.19 FEET FROM THE SOUTHWESTERLY END OF SAID CURVE. SAID CURVE BEING DESCRIBED IN SAID DEED AS HAVING A CENTER LINE RADIUS OF 245.10 FEET AND LENGTH OF 51.07 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE IN SAID EASTERLY LINE 43.19 FEET TO THE END THEREOF AND THE BEGINNING OF A TANGENT CURVE. CONCAVE SOUTHEASTERLY. HAVING A RADIUS OF 312.32 FEET; THENCE SOUTHWESTERLY LONG SAID TANGENT CURVE 155.75 FEET TO A POINT; THENCE LEAVING SAID EASTERLY LINE ALONG A RADIAL LINE OF LAST MENTIONED CURVE TO SAID POINT SOUTH 79° 13' 02" EAST 222.51 FEET; THENCE SOUTH 20° 15" 12" EAST 22.00 FEET; THENCE NORTH 55° 35' 38" EAST 143.04 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPT THEREFROM THE FOLLOWING:

THAT PORTION OF FRACTIONAL SECTION 34, TOWNSHIP 1 NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 8, 1897, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34, DISTANT THEREON SOUTH 36° 19' 39" EAST 480.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY BOUNDARY WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE 30 FEET WIDE. AS DESCRIBED IN DEED TO THE CITY OF LOS ANGELES. RECORDED ON FEBRUARY 5, 1933. AS INSTRUMENT NO. 732. IN BOOK 12076 PAGE 33. OFFICIAL RECORDS. IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 1° 47' 02" WEST 724.93 FEET; THENCE SOUTH 73° 11' 21" EAST 50.00 FEET; THENCE SOUTH 69°43 53" WEST 254.74 FEET; THENCE NORTH 43° 12' 02" WEST 200.25 FEET; THENCE NORTH 11°57'02" WEST 6.81 FEET; THENCE SOUTH 55°35 38" WEST 143.04 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 20° 15' 12" WEST 10.00 FEET: THENCE NORTH 74° 25' 59" EAST 30.00 FEET: THENCE SOUTH 55° 35' 38" WEST 30.84 FEET TO THE TRUE POINT OF BEGINNING.

ALSO EXCEPT THAT PORTION OF FRACTIONAL SECTION 34, TOWNSHIP 1 NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES. COUNTY OF LOS ANGELES. STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 8, 1897. DESCRIBED AS FOLLOWS:

# EXHIBIT A
**(Continued)**

BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34, DISTANT THEREON SOUTH 88°19' 89" EAST 480.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY BOUNDARY WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE, 60 FEET WIDE, AS DESCRIBED IN DEED TO THE CITY OF LOS ANGELES, RECORDED ON FEBRUARY 8, 1933 AS INSTRUMENT NO. 732, IN BOOK 12076 PAGE 33, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 1° 47' 02" WEST 724.93 FEET; THENCE SOUTH 73° 11' 21" EAST 50.00 FEET; THENCE SOUTH 69°48 53" WEST 254.74 FEET; THENCE NORTH 43°12' 02" WEST 200.25 FEET; THENCE NORTH 11°5?' 02" WEST 6.81 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 55° 35' 38" WEST 74.00 FEET; THENCE NORTH 34°24'22" WEST 9.00 FEET; THENCE NORTH 56°53'45" EAST 44.01 FEET; THENCE NORTH 53°40'58" EAST 30.02 FEET; THENCE SOUTH 34°24' 22" EAST 9.00 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES, LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID PROPERTY, BUT WITH NO RIGHT OF SURFACE ENTRY, WHERE THEY HAVE BEEN PREVIOUSLY RESERVED IN INSTRUMENTS OF RECORD.

PARCEL NO. 2:

AN EASEMENT AND RIGHT OF WAY FOR ROAD PURPOSES TO BE USED IN COMMON. WITH OTHERS ENTITLED TO THE USE THEREOF, IN, OVER, UNDER AND ACROSS THOSE PORTIONS OF FRACTIONAL SECTION 34, TOWNSHIP 1. NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES. COUNTY OF LOS ANGELES. STATE OF CALIFORNIA. ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 8. 1897, DESCRIBED AS FOLLOWS:

(A) A STRIP OF LAND 20.00 FEET WIDE, LYING 10.00 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTER LINE:

BEGINNING AT THE INTERSECTION OF THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34, WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE. 60 FEET WIDE, AS DESCRIBED IN THE DEED TO THE CITY OF LOS ANGELES, RECORDED ON FEBRUARY 8, 1983. AS INSTRUMENT NO. 732, IN BOOK 12076. PAGE 33. OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID EASTERLY LINE AS FOLLOWS:

SOUTHERLY ALONG A CURVE THEREIN, CONCAVE WESTERLY HAVING A RADIUS OF 200.00 FEET, A DISTANCE OF 64.31 FEET TO THE END THEREOF, AND TANGENT TO SAID CURVE SOUTH 2°47' 58" EAST 68.24 FEET TO THE TRUE POINT OF BEGINNING, THENCE LEAVING SAID EASTERLY LINE SOUTH 80° 16' 26" EAST 15.73 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 60.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE 59.96 FEET; THENCE TANGENT TO SAID CURVE SOUTH 23° 00' 44" EAST 52.42 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 200.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE 49.37 FEET; THENCE TANGENT TO SAID CURVE SOUTH 8° 52' 12" EAST 75.35 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 200.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE 58.69 FEET; THENCE TANGENT TO SAID CURVE SOUTH 7°22'10" WEST 150.34 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE EASTERLY, HAVING A RADIUS OF 200.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE 67.44 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE 90.78 FEET; THENCE TANGENT TO SAID CURVE SOUTH 43°12" 02" EAST 137.12 FEET TO A POINT TO BE KNOW AS POINT "A" FOR PURPOSES OF THIS DESCRIPTION. THE NORTHERLY SIDE LINE OF SAID STRIP OF LAND AT ITS NORTHERLY END, TO BE EXTENDED WESTERLY, SO AS TO TERMINATE IN SAID EASTERLY LINE OF BENEDICT CANYON DRIVE.

(B) BEGINNING AT A POINT "A" ABOVE DESCRIBED: THENCE NORTH 46°47'58" EAST 10.00 FEET TO THE BEGINNING OF A CURVE, CONCAVE NORTHEASTERLY. HAVING A RADIUS OF 15.00 FEET (A RADIAL LINE

PRELIMINARY REPORT                                                  Fidelity National Title Company
YOUR REFERENCE:                                          ORDER NO.:  00225973-994-VNO-RR1

## EXHIBIT A
### (Continued)

TO CURVE AT SAID BEGINNING OF CURVE BEARS SOUTH 46° 47' 53" WEST); THENCE SOUTHEASTERLY ALONG SAID CURVE 8.79 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 15.00 FEET; THENCE SOUTHEASTERLY, SOUTHERLY, SOUTHWESTERLY, WESTERLY, AND NORTHWESTERLY ALONG SAID CURVE 64.89 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 15.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE 8.79 FEET TO A POINT DISTANT SOUTH 45° 47' 58" WEST 10.00 FEET FROM SAID POINT "A"; THENCE NORTH 46° 47' 58" EAST 10.00 FEET TO SAID POINT "A".

APN:  **4382-001-023**

PRELIMINARY REPORT                                                                 Fidelity National Title Company
YOUR REFERENCE:                                                          ORDER NO.:  00225973-994-VNO-RR1

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

1.      Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2019-2020.

2.      An assessment by the improvement district shown below

        Assessment (or Bond) No.:       None shown
        Series:                         Ad #1
        District:                       County of Los Angeles
        For:                            Mrca-Brush Fire Clear'g Dist #1
        Bond Issued:                    August 6, 2003
        Original Amount:                $0.00

        Said assessment is collected with the county/city property taxes.

        Please contact your title officer for updated amounts prior to the close of escrow.

3.      The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4,  respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

        Note: If said supplementals (if any) are not posted prior to the date of closing, this company assumes no liability for payment thereof.

4.      Water rights, claims or title to water, whether or not disclosed by the public records.

5.      Covenants, conditions, or restrictions, if any, appearing in the Public Records; however, this policy insures against loss or damage arising from:

        (a) the violation of those covenants, conditions, or restrictions on or prior to Date of Policy;
        (b) a forfeiture or reversion of Title from a future violation of those covenants, conditions, or restrictions, including those relating to environmental protection; and
        (c) provisions in those covenants, conditions, or restrictions, including those relating to environmental protection, under which the lien of the Insured Mortgage can be extinguished, subordinated, or impaired..

        As used in paragraph 2(a), the words "covenants, conditions, or restrictions" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded or filed in the Public Records at Date of Policy and is not referenced in an addendum attached to this policy.

6.      Any easements or servitudes appearing in the Public Records; however, this policy insures against loss or damage arising from (a) the encroachment, at Date of Policy, of the improvements on any easement, and (b) any interference with or damage to existing improvements, including lawns, shrubbery, and trees, resulting from the use of the easements for the purposes granted or reserved.

PRELIMINARY REPORT                                                      Fidelity National Title Company
YOUR REFERENCE:                                         ORDER NO.:  00225973-994-VNO-RR1

## EXCEPTIONS
### (Continued)

7.      Any lease, grant, exception, or reservation of minerals or mineral rights appearing in the Public Records; however, this policy insures against loss or damage arising from (a) any affect on or impairment of the use of the Land for residential one-to-four family dwelling purposes by reason of such lease, grant, exception or reservation of minerals or mineral rights, and (b) any damage to existing improvements, including lawns, shrubbery, and trees, resulting from the future exercise of any right to use the surface of the Land for the extraction or development of the minerals or mineral rights so leased, granted, excepted, or reserved. Nothing herein shall insure against loss or damage resulting from subsidence.

8.      A deed of trust to secure an indebtedness in  the amount shown below,

| | |
|---|---|
| Amount: | $8,525,000.00 |
| Dated: | August 5, 2017 |
| Trustor/Grantor: | Ahmad Khawaja, a married man as his sole and separate property |
| Trustee: | Fidelity National Title Ins Co |
| Beneficiary: | Wells Fargo Bank, N.A., The United States of America Corporation |
| Loan No.: | None shown |
| Recording Date: | August 9, 2017 |
| Recording No: | 20170893980, Official Records |

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

**END OF EXCEPTIONS**

---

## REQUIREMENTS SECTION

1.      In order to complete this report, the Company requires a Statement of Information to be completed by the following party(s),

        Party(s):                    All Parties

        The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

        NOTE: The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

---

### END OF REQUIREMENTS

---

## INFORMATIONAL NOTES SECTION

1.  Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

2.  Due to the special requirements of SB 50 (California Public Resources Code Section 8560 et seq.), any transaction that includes the conveyance of title by an agency of the United States must be approved in advance by the Company's State Counsel, Regional Counsel, or one of their designees.

3.  None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement Form 9 to an Extended Coverage Loan Policy, when issued.

4.  Note: The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land a Single Family Dwelling, known as 3100 Benedict Canyon Drive, Beverly Hills, California to an Extended Coverage Loan Policy.

5.  Note: The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration provision. Arbitrable matters may include, but are not limited to any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance Coverage.

6.  The only deed(s) affecting said land which recorded within twenty-four (24) months of the date of this report, is (are) as follows:

    Grantor:            Ana Stoliarova, spouse of grantee
    Grantee:            Ahmad Khawaja, a married man as his sole and separate property
    Recording Date:     August 9, 2017
    Recording No.:      20170893978, Official Records

    Grantor:            3100 Benedict Canyon Rd. LLC., a California Limited Liability Company
    Grantee:            Ahmad Khawaja, a married man as his sole and separate property
    Recording Date:     August 9, 2017
    Recording No.:      20170893979, Official Records

7.  Note: Property taxes for the fiscal year shown below are PAID. For proration purposes the amounts were:

    Tax Identification No.:   4382-001-023
    Fiscal Year:              2018-2019
    1st Installment:          $93,205.53
    2nd installment:          $93,205.52
    Exemption:                $0.00
    Land:                     $8,549,800.00
    Improvements:             $6,950,200.00
    Code Area:                00067
    Personal Property:        $0.00

8.  Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax. If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

PRELIMINARY REPORT                                                    Fidelity National Title Company
YOUR REFERENCE:                                           ORDER NO.:  00225973-994-VNO-RR1

# INFORMATIONAL NOTES
### (Continued)

9.  If a county recorder, title insurance company, escrow company, real estate broker, real estate agent or association provides a copy of a declaration, governing document or deed to any person, California law requires that the document provided shall include a statement regarding any unlawful restrictions. Said statement is to be in at least 14-point bold face type and may be stamped on the first page of any document provided or included as a cover page attached to the requested document. Should a party to this transaction request a copy of any document reported herein that fits this category, the statement is to be included in the manner described.

10. Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of an agent, an authorized employee of the insured lender, or by using Bancserv or other approved third party service. If the above requirements cannot be met, please call the Company at the number provided in this report

11. NOTE: Amended Civil Code Section 2941, which becomes effective on January 1, 2002, sets the fee for the processing and recordation of the reconveyance of each Deed of Trust being paid off through this transaction at $45.00. The reconveyance fee must be clearly set forth in the Beneficiary's Payoff Demand Statement ("Demand"). In addition, an assignment or authorized release of that fee, from the Beneficiary to the Trustee of record, must be included. An example of the required language is as follows:

    The Beneficiary identified above hereby assigns, releases or transfers to the Trustee of record, the sum of $45.00, included herein as 'Reconveyance Fees', for the processing and recordation of the Reconveyance of the Deed of Trust securing the indebtedness covered hereby, and the escrow company or title company processing this pay-off is authorized to deduct the Reconveyance Fee from this Demand and forward said fee to the Trustee of record or the successor Trustee under the Trust Deed to be paid off in full.

    In the event that the reconveyance fee and the assignment, release or transfer are not included within the demand statement, then Fidelity National Title Insurance Company and its Underwritten Agent may decline to process the reconveyance and will be forced to return all documentation directly to the Beneficiary for compliance with the requirements of the revised statute.

12. Note: Part of the RESPA Rule to simplify and Improve the Process of Obtaining Mortgages and Reduce Consumer Settlement Costs requires the settlement agent to disclose the agent and underwriter split of title premiums, including endorsements as follows:

    Line 1107 is used to record the amount of the total title insurance premium, including endorsements, that is retained by the title agent. Fidelity National Title Company retains 88% of the total premium and endorsements.

    Line 1108 used to record the amount of the total title insurance premium, including endorsements, that is retained by the title underwriter. Fidelity National Title Insurance Company retains 12% of the total premium and endorsements.

---

## END OF INFORMATIONAL NOTES

---

Ruben Rosas/nd1

**WIRE SAFE**™ | Inquire before you wire!

# Wire Fraud Alert

*This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.*

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*              *Internet Crime Complaint Center:*
*http://www.fbi.gov*                                  *http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

**EXHIBIT 2, Page 44**

# FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

**Types of Information Collected**
We may collect two types of information from you: Personal Information and Browsing Information.

Personal Information. FNF may collect the following categories of Personal Information:
- contact information (*e.g.,* name, address, phone number, email address);
- demographic information (*e.g.,* date of birth, gender, marital status);
- identity information (*e.g.,* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.,* loan or bank account information); and
- other personal information necessary to provide products or services to you.

Browsing Information. FNF may automatically collect the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or mobile device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website

**How Personal Information is Collected**
We may collect Personal Information about you from:
- information we receive from you on applications or other forms;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**How Browsing Information is Collected**
If you visit or use an FNF Website, Browsing Information may be collected during your visit. Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to other websites. FNF is not responsible for the privacy practices or the content of any of those other websites. We advise you to read the privacy policy of every website you visit.

**Use of Personal Information**
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and third parties' products and services, jointly or independently.

**When Information Is Disclosed**
We may make disclosures of your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or

EXHIBIT 1 Page 45
Order No. 00223342994-VNO-RR1

- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

Please see "**Choices With Your Information**" to learn the disclosures you can restrict.

**Security of Your Information**
We maintain physical, electronic, and procedural safeguards to guard your Personal Information. We limit access to nonpublic personal information about you to employees who need to know that information to do their job. When we provide Personal Information to others as discussed in this Privacy Notice, we expect that they process such information in compliance with our Privacy Notice and in compliance with applicable privacy laws.

**Choices With Your Information**
If you do not want FNF to share your information with our affiliates to directly market to you, you may send an "opt out" request by email, phone, or physical mail as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties, except as permitted by California law.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not share information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**
The FNF Websites are meant for adults and are not intended or designed to attract persons under the age of eighteen (18). We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence for any of the purposes described in this Privacy Notice. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices With Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except (1) as required or authorized by contract with the mortgage loan servicer or lender, or (2) as required by law or in the good-faith belief that such disclosure is necessary to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The revised Privacy Notice, showing the new revision date, will be posted on the FNF Website. Each time you provide information to us following any amendment of this Privacy Notice, your provision of information to us will signify your assent to and acceptance of the terms of the revised Privacy Notice for all previously collected information and information

collected from you in the future. We may use comments, information or feedback that you submit to us in any manner that we may choose without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**
If you have questions, would like to access or correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, send your requests via email to privacy@fnf.com, by phone to (888) 934-3354, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the field rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for each discount. These discounts only apply to transaction involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

**FNF Underwritten Title Company**          **FNF Underwriter**
FNTC - Fidelity National Title Company      FNTIC - Fidelity National Title Insurance Company
FNTCCA – Fidelity National Title Company of California

**Available Discounts**
**CREDIT FOR PRELIMINARY REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (FNTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**DISASTER LOANS (FNTIC)**
The charge for a lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 40% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

**ATTACHMENT ONE**

**CALIFORNIA LAND TITLE ASSOCIATION**
**STANDARD COVERAGE POLICY – 1990**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a)   Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b)   Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a)   whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b)   not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c)   resulting in no loss or damage to the insured claimant;
   (d)   attaching or created subsequent to Date of Policy; or
   (e)   resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims;  (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE**

**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a.   building;
   b.   zoning;
   c.   land use;
   d.   improvements on the Land;
   e.   land division; and
   f.   environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a.   that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b.   that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

c.  that result in no loss to You; or
d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.
6.  Lack of a right:
    a.  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.  in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00%   % of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00%   % of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk  6.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

(Except as provided in Schedule B - Part II,( t(or T)his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

**EXHIBIT 2, Page 50**

(PART I

(The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.

PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:)

**2006 ALTA OWNER'S POLICY (06-17-06)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)   the occupancy, use, or enjoyment of the Land;
   (ii)  the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
(The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.
7. (Variable exceptions such as taxes, easements, CC&R's, etc. shown here.)

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (12-02-13)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
    (b)  Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law.  This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.



This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon

This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

**EXHIBIT 2, Page 53**

## STATEMENT OF INFORMATION
**CONFIDENTIAL INFORMATION STATEMENT TO BE USED IN CONNECTION WITH ORDER NO: 00225973-994-RR1**
*COMPLETION OF THIS FORM WILL EXPEDITE YOUR ORDER AND WILL HELP PROTECT YOU.*

### THE STREET ADDRESS of the property in this transaction is:
IF NONE LEAVE BLANK

ADDRESS:             CITY:

IMPROVEMENTS: ☐ SINGLE RESIDENCE    ☐ MULTIPLE RESIDENCE    ☐ COMMERCIAL
OCCUPIED BY:     ☐ OWNER          ☐ LESSEE         ☐ TENANTS
ANY PORTION OF NEW LOAN FUNDS TO BE USED FOR CONSTRUCTION:    ☐ YES    ☐ NO

### NAME                                    SPOUSES NAME

| FIRST | MIDDLE | LAST | FIRST | MIDDLE | LAST |
|---|---|---|---|---|---|

BIRTHPLACE        BIRTH DATE        BIRTHPLACE        BIRTH DATE

I HAVE LIVED IN CALIFORNIA SINCE     SOCIAL SECURITY NUMBER     I HAVE LIVED IN CALIFORNIA SINCE     SOCIAL SECURITY NUMBER

DRIVER'S LICENSE NO.                DRIVER'S LICENSE NO.

WIFE'S MAIDEN NAME:

WE WERE MARRIED ON             AT

### RESIDENCE(S) FOR LAST 10 YEARS

| NUMBER AND STREET | CITY | FROM | TO |
|---|---|---|---|
| NUMBER AND STREET | CITY | FROM | TO |
| NUMBER AND STREET | CITY | FROM | TO |
| NUMBER AND STREET | CITY | FROM | TO |

### OCCUPATION(S) FOR LAST 10 YEARS
**HUSBAND**

| PRESENT OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
|---|---|---|---|
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |

**WIFE**

| PRESENT OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
|---|---|---|---|
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |

**FORMER MARRIAGES:** IF NO FORMER MARRIAGES, WRITE "NONE":

NAME OF FORMER SPOUSE

IF DECEASED: DATE             WHERE

**CURRENT LOAN ON PROPERTY**

PAYMENTS ARE BEING MADE TO:             2.

1.                           3.

HOMEOWNERS ASSOCIATION             NUMBER:

DATE _____    SIGNATURE _____

         HOME PHONE _____    BUSINESS PHONE _____

MISC0008 (Rev. 09/15/2011)

**EXHIBIT 2, Page 55**



**Fidelity National Title Company**
5000 Van Nuys Blvd., Suite 500, Sherman Oaks, CA 91403
Phone: (818) 881-7800   ●   Fax: (818) 776-8528

## CREDIT LINE / EQUITY LINE OF CREDIT CLOSURE REQUEST

Date: _____

To: _____

_____

_____

_____

**Attention:**  Payoff Dept.
**Reference:**  Account/Loan # _____
**Property Address:**      3100 Benedict Canyon Drive, Beverly Hills, Los Angeles, CA 90210

To Whom It May Concern:

Please accept this letter as a request to close/freeze the above-referenced credit line or equity line of credit as of this date.

I/We agree not to request any advances on this account on or after the date of this letter.

You will be receiving payment in full from the proceeds of our escrow transaction. Upon receipt of payoff, please send your Reconveyance or Release of Lien to:

**Fidelity National Title Company**
5000 Van Nuys Blvd., Suite 500
Sherman Oaks, CA 91403
Attn:  Ruben Rosas
Ref:  00225973-994-RR1

Sincerely,

_____          _____

_____          _____

_____          _____

(All borrowers must sign)

REQ00001 (Rev. 12/5/2012)

**EXHIBIT 2, Page 56**

# EXHIBIT 3

KATHY BAZOIAN PHELPS (155564)
*kphelps@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone:  (310) 651-2997

Christopher D. Sullivan (148083)
*csullivan@diamondmccarthy.com*
Karen K. Diep (305587)
*kdiep@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Telephone: (415) 692-5200

*Proposed Counsel for Stephen J. Donell,*
*Liquidating Receiver*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:19-cv-04355 |
| Plaintiff, | **RECEIVER'S CERTIFICATE OF INDEBTEDNESS NO. ___** |
| v. | |
| ALLIEDWALLET, INC., ET AL., | |
| Defendants. | |

## RECEIVER'S CERTIFICATE OF INDEBTEDNESS NO. ___

1.     For good and valuable consideration, receipt of which is hereby acknowledged, Stephen J. Donell, Receiver in the above-entitled matter (the

**EXHIBIT 3, Page 58**

"Receiver"), solely in his capacity as Receiver herein, and pursuant to the Court's June ___, 2019 Order Granting *Ex Parte* Emergency Application of Receiver for Order Authorizing: (1) Employment of Philip Seymour/Keller Williams as Real Estate Broker and Appraiser; (2) Appointment of Brentwood Property Appraisal, Inc. and Lipsey Appraisal Services as Additional Appraisers; (3) Priority Borrowing and Issuance of Receiver's Certificates; (4) Employment of Diamond McCarthy LLP as General Counsel; and (5) Authority to Return Prorated Mortgage Payment to Defendant; and for Order for Stay of Actions Affecting Receivership Property ("Order") issues this Receiver's Certificate of Indebtedness No. __ (the "Certificate") in the sum of [up to Three Hundred Thousand and No/100 Dollars ($400,000.00)] (the "Advanced Amount") to SVR Capital Trust, 8951 Research Drive, Irvine, CA 92618 ("SVR"), in its own right, in exchange for commensurate funds advanced to the Receiver by SVR.  The Receiver shall use the funds advanced by SVR to pay in his discretion to fund necessary and appropriate expenses in connection with the exercise of the Receiver's powers and duties to fund the preservation and maintenance of the assets of the receivership estate and to pay other administrative expenses of the receivership estate associated with the Receiver's liquidation of the 3100 Benedict Canyon Drive, Beverly Hills, California ("Benedict Canyon Real Property"), and (b) all furnishings and other personal property purchased for and/or located at the Benedict Canyon Real Property (collectively, the "Receivership Property").

2.     The indebtedness evidenced by this Certificate shall be subject and subordinate to all administrative and operating expenses of the Receiver and any professionals engaged pursuant to the terms of the Order, and subsequent orders of the Court.  Except as contemplated in the immediately preceding sentence, this Certificate shall have priority over all other general claims against the Receivership

Estate, and shall be prior and superior to all liens, encumbrances, and claims against the Benedict Canyon Real Property, with the exception only of the senior lien securing accrued and accruing real property taxes against the Benedict Canyon Real Property. The amount of any unpaid principal and unpaid interest shall also be and constitute a part of the indebtedness secured by an applicable Deed(s) of Trust.

3.      The indebtedness evidenced by this Certificate shall be all due and payable when the above-captioned Court issues an order approving the Receiver's final account and report in this matter. The maturity date of this Certificate, identified below, may be extended by the above-captioned Court from time to time in the Court's sole discretion.

4.      This Certificate is subject to full or partial redemption at any time before maturity, without any prepayment penalty, by payment to SVR of the principal and interest then owing if, in the sole discretion of the Receiver, there are sufficient funds in the Receivership Estate to make such payment. Payments shall first be credited to interest, then costs, then principal. Upon payment in full of this Certificate, SVR shall immediately return the original Certificate to the Receiver, marked "Paid In Full" thereon, and signed by a duly authorized officer or agent of SVR, and concurrently deliver a properly executed Full Reconveyance(s) of any previously recorded Deed(s) of Trust.

5.      SVR is entitled to, but is not required to, file this Certificate or a financing statement (Form UCC-1) as a fixture filing to perfect a security interest in fixtures as those terms are defined under California Uniform Commercial Code section 9102(40) and 9102(41) to perfect the security interest granted hereby in any fixtures upon the Benedict Canyon Real Property. For the avoidance of any doubt, SVR shall have no security interest, lien, rights, interest or encumbrance upon any

personal property assets located at, in or on the Benedict Canyon Real Property except to the extent the personal property qualifies as a "fixture" and is so related to the Benedict Canyon Real Property as to render the interest in such property an interest that arises under real property law.  The "debtors" named in such fixture filing shall be Defendant Ahmad Khawaja and the Receiver.  The Receiver has no recordation responsibilities.

6.      This Certificate bears simple interest at a rate of fifteen percent (15%) per annum from the date of receipt by the Receiver of the funds to be advanced by SVR, with a maturity date eighteen (18) months from the date of its issuance.  This Certificate is subject to the express condition that at no time shall the Receiver be obligated or required to pay interest on the principal balance of the Advanced Amount at a rate which could subject SVR to either civil or criminal liability as a result of being in excess of the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by this Certificate and as provided for herein, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the loan contemplated hereby (such rate, the "Maximum Legal Rate").  If, by the terms of this Certificate, the Receiver is at any time required or obligated to pay interest on the principal balance due on the Advanced Amount at a rate in excess of the Maximum Legal Rate, the interest rate shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to SVR for the use, forbearance, or detention of the sums due under this Certificate, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full

stated term of the loan contemplated hereby until payment in full so that the rate or amount of interest on account of the Advanced Amount does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Advanced Amount for so long as the loan contemplated hereby is outstanding.

7.      The Receiver shall pay SVR a fee in the amount of five per cent (5%) of the Advanced Amount, which fee shall be payable upon maturity.

8.      This Certificate evidences an obligation only of the Receivership Estate in the above-captioned action, and is not a personal obligation of the Receiver, his counsel, or any of his professionals engaged pursuant to the terms of the Order, or any subsequent orders of the Court.  Unpaid principal and interest shall be payable by the Receiver only from the proceeds of the Benedict Canyon Real Property, and to the extent such proceeds are insufficient to pay any and all sums due and owing pursuant to the Certificate, neither the Receiver, his counsel, nor any of his professionals engaged pursuant to the terms of the Order, or subsequent orders of the Court shall bear any personal liability for a deficiency.

9.      Any action regarding this Certificate and the indebtedness evidenced hereby or security interest granted with respect hereto shall be brought exclusively and maintained in the above-captioned Court.

10.     This Certificate is not transferable or assignable without an Order from the above-captioned Court authorizing such transfer or assignment.

11.     This Certificate will be effective when signed by the Receiver and delivered to SVR.

12.     This Certificate is issued under the authority of the United States District Court for the Central District of California, and pursuant to the express terms

of the Order.

Executed this        day of June 2019, at Los Angeles, California.


Stephen J. Donell, Receiver

**RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:**

Stephen J. Donell
Receiver
12121 Wilshire Boulevard, Suite 1120
Los Angeles, California 90025

**SPACE ABOVE THIS LINE FOR RECORDER'S USE**

## DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

This DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this *"Instrument"*) is made as of _____, 2019, and is given by STEPHEN J. DONELL, in his sole capacity as court-appointed liquidating receiver ("*Receiver*"), in the matter entitled *Federal Trade Commission v. AlliedWallet, Inc., et. al.,* Case No. 2:19-cv-04355-SVW-E (the "*Action*") pending in the United States District Court for the Central District of California, (the "*Court*"), to FIDELITY NATIONAL TITLE COMPANY ("*Trustee*"), for the benefit of the SVR CAPITAL TRUST ("*Lender*").

WHEREAS, Receiver is the duly appointed receiver in the Action;

WHEREAS, Receiver, pursuant to that certain Order Granting *Ex Parte* Emergency Application of Receiver for Order Authorizing: (1) Employment of Philip Seymour/Keller Williams as Real Estate Broker and Appraiser; (2) Appointment of Brentwood Property Appraisal, Inc. and Lipsey Appraisal Services as Additional Appraisers; (3) Priority Borrowing and Issuance of Receiver's Certificates; (4) Employment of Diamond McCarthy LLP as General Counsel; and (5) Authority to Return Prorated Mortgage Payment to Defendant; and for Order for Stay of Actions Affecting Receivership Property filed _____, 2019 (the "*Order*"), was authorized by the Court to issue that certain Receiver's Certificate of Indebtedness No. 1 dated on or before the date hereof (the "*Note*") in favor of Lender in the principal amount of up to Four Hundred Thousand and 00/100 Dollars ($400,000.00) (the "*Loan*"), which Note is secured by this Instrument; and

WHEREAS, Capitalized terms used herein and not defined shall have the meanings ascribed to such terms in the Order or the Note, as applicable.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Receiver hereby irrevocably grants, conveys and assigns to Trustee in trust, the following described property, rights and interests (referred to collectively herein as the *"Property"*), and as to any portion of the Property constituting property subject to the Uniform Commercial Code of the State of California as from time to time in effect (the *"Code"*), this Instrument is intended to be a security agreement under the Code for the purpose of creating hereby a security interest in such portion of the Property that Receiver hereby grants to Lender as secured party, and with all terms used below with respect to such portion of the Property which are defined in the Code to have the meanings provided in the Code: (a) the real property located in the City of Los Angeles, County of Los Angeles, State of California, commonly known as 3100 Benedict Canyon Drive (APN 4382-001-023), and more particularly described on Exhibit A attached hereto and incorporated herein by reference for all purposes (*"Real Property"*); (b) all buildings and improvements now or hereafter erected on the Real Property,

**EXHIBIT 3, Page 64**

including replacements and additions thereto, which shall be deemed to be and remain a part of the Real Property covered by this Instrument; (c) all rents, revenues, issues, profits, proceeds, income, royalties, accounts, escrows, letter-of-credit rights, security deposits, impounds, reserves, tax refunds and other rights to monies from the Real Property (if any) (**"Property Income"**) to be applied against the Note; provided, however, that Receiver, so long as no "Event of Default" (as hereinafter defined) has occurred and is continuing hereunder, may collect rent as it becomes due, but not more than one month in advance thereof; (d) all interest of Receiver in all leases now or hereafter on the Real Property, whether written or oral, together with all security therefor and all monies payable thereunder, subject, however, to the conditional permission given to Receiver to collect the rentals under any such lease(s); (e) all fixtures and articles of personal property now or hereafter forming a part of or used in connection with the Real Property and/or improvements thereon and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are or shall be attached to the Real Property in any manner except only insofar as such personal property qualifies as a "fixture" under California Uniform Commercial Code section 9102(41) and a financing statement (Form UCC-1) relating to such property, if any, qualifies as and constitutes a "fixture filing" under California Uniform Commercial Code section 9102(40).  For the avoidance of any doubt, Lender shall have no security interest, lien, rights, interest or encumbrance upon any personal property assets located at, in or on the Benedict Canyon Real Property except to the extent the personal property qualifies as a "fixture" and is so related to the Benedict Canyon Real Property as to render the interest in such property an interest that arises under real property law and would be covered by "fixture filing" under California Uniform Commercial Code sections 9102(41) and 9102(40); (f) all of the Receivership Estate's interests in general intangibles, including payment intangibles now owned or hereafter acquired and related to the Property, including, without limitation, all right, title and interest in and to: (i) all agreements, licenses, plans, permits, contracts and construction documents to which Receiver is or may become a party and/or which relate to the Property; (ii) all intellectual property related to the Property; and (g) subject to approval by the Court, all proceeds of the foregoing, including, without limitation, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the Property or any portion thereof under the power of eminent domain, any proceeds of any policies of insurance, maintained with respect to the Property and proceeds of any sale, option or contract to sell the Property or any portion thereof.

THIS INSTRUMENT SECURES TO LENDER Receiver's performance of its obligations under the Note, and all of Receiver's obligations under any other instrument or document evidencing or securing the Loan or otherwise executed by Receiver in connection therewith, together with all modifications, extensions, renewals and replacements thereof.

Pursuant to the Order, the indebtedness evidenced by the Note and secured by this Instrument shall have priority over all other general claims against the Property, with the exception of only the accruing real property taxes against the Property, and shall be subject and subordinate to all administrative and operating expenses of Receiver and any professionals engaged by Receiver pursuant to the terms of the Order, and any subsequent orders of the Court.

Receiver represents, warrants, covenants and agrees in favor of Lender and Trustee as follows:

**SECTION 1.  PAYMENT OF INDEBTEDNESS**.  Receiver shall promptly pay out of the Receivership Estate all moneys due under the Note and any other sums secured by this Instrument.

**SECTION 2.  APPLICATION OF PAYMENTS**.  Lender may apply any payments received from or on behalf of Receiver to any of the obligations of Receiver then due under the Note or this Instrument in any order determined by Lender.

**SECTION 3.   CHARGES; LIENS**.   Receiver shall pay all rents, taxes, assessments and other impositions attributable to the Property if and when required by the Court.   Upon written request, Receiver shall promptly furnish to Lender receipts evidencing such payments.

**SECTION 4.  RESERVED**.

**SECTION 5.  PRESERVATION AND MAINTENANCE OF PROPERTY**.  Receiver (a) shall not commit intentional physical waste or permit further impairment or deterioration of the Property; and/or (b) shall not abandon the Property.

**SECTION 6.  RESERVED**.

**SECTION 7.   ADDITIONAL SECURITY; COLLECTION OF RENTS**.  As additional security, Receiver hereby gives to and confers upon Lender the right, power and authority, during the continuance of this Instrument and the term of the Note, to collect the Property Income (if any), reserving unto Receiver the right, at any time while an Event of Default is not continuing, to collect and retain the Property Income (if any) as it becomes due and payable.

**SECTION 8.       RESERVED**.

**SECTION 9.  SECURITY AGREEMENT AND FIXTURE FILING**.  This Instrument is both a real property deed of trust and a "security agreement" within the meaning of the Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of the Receivership Estate in the Property.  Receiver, by executing and delivering this Instrument, has granted and hereby grants to Lender, as security for the obligations of Receiver under the Note, a security interest in the Property to the full extent that the Property may be subject to the Code (such portion of the Property so subject to the Code being called in this paragraph the **"Collateral"**).   This Instrument shall also constitute a "fixture filing" for the purposes of the Code.  As such, this Instrument covers all items of the Collateral that are or are to become fixtures. If an Event of Default shall occur and be continuing, Lender, subject to approval by the Court, may exercise any and all rights and remedies granted to a secured party upon default under the Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as the Court may approve as necessary for the care, protection and preservation of the Collateral.  Subject to approval by the Court, the proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to any payments due by Receiver under the Note in such priority and proportions as the Court in its sole discretion shall deem proper.   In the event of any change in name, identity or structure of Receiver, Receiver shall notify Lender thereof and promptly after request shall execute, file and record such Code forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Collateral.  If Lender shall require the filing or recording of additional Code forms or continuation statements, Lender may execute, file and record such Code forms or continuation statements as Lender shall deem reasonably necessary (and in all instances subject to the prior approval by the Court).  Notwithstanding anything to the contrary in this Instrument, Receiver shall have no recordation responsibilities hereunder.

With respect to fixtures, Lender or Trustee may elect to treat same as either real property or personal property and proceed to exercise such rights and remedies applicable to the categorization so chosen.  Subject to approval by the Court, Lender may proceed against the items of real property and any items of Collateral separately or together in any order whatsoever, without in any way affecting or waiving Lender's rights and remedies under the Code, this Instrument or the Note.

**SECTION 10.  TRANSFERS OF THE PROPERTY.**  Lender, subject to approval by the Court, may declare all sums secured hereby immediately due and payable, except as expressly limited by law or otherwise ordered by the Court, if, without Lender's prior written consent: (a) Receiver sells, conveys, contracts to sell, alienates or further encumbers all or any part of the Property; (b) Receiver permits the title or any interest in the Property to be divested, whether voluntarily or involuntarily; or (c) Receiver places any further encumbrance on title to the Property that jeopardizes Lender's super-priority lien on the Property.

**SECTION 11.  EXPENSES; REIMBURSEMENT OF LENDER'S EXPENSES**.  All amounts disbursed by Lender pursuant to this Instrument, with interest thereon, shall be additional indebtedness of the Receivership Estate secured by this Instrument.  All such amounts shall be immediately due and payable and shall bear interest from the date of disbursement at the interest rate in effect on the Note from time to time, or at the maximum rate that may be collected from Receiver on such amounts by the payee thereof under applicable law if that is less.

**SECTION 12.  DEFAULTS; ACCELERATION; REMEDIES.**

Each of the following shall constitute an ***"Event of Default"*** under this Instrument:

  (a) Any failure of Receiver to pay any money within five (5) days after the same becomes due under the Note.

  (b) Other than as specified in item (a) above, any breach of any material covenant, representation, warranty, or other obligation of Receiver under this Instrument or the Note, which breach is not completely cured on or before the thirtieth (30th) day after notice of the same from Lender to Receiver; provided, however, that if the default is capable of cure but with diligence cannot be cured within such period of thirty (30) days, and if Receiver shall have given Lender evidence satisfactory to Lender that Receiver has commenced the cure within ten (10) days after the first notice of default and at all times after such commencement has pursued such cure diligently, then such period shall be extended for so long as is reasonably necessary, but in no event beyond ninety (90) days after the original notice of default.

  Upon the occurrence and during the continuance of any Event of Default, Lender may only bring an action against the Property to the Court, as its sole and exclusive remedy.

  Upon any sale made hereunder made by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale by the Court, Lender, if approved by the Court, may bid for and acquire the Property, or any part thereof, and in lieu of paying cash therefore, may make settlement for the purchase price by crediting upon the Note the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums that Lender is authorized to deduct under this Instrument or the Note.

**SECTION 13.  RELEASE**.  Upon payment of all sums and the performance of all obligations secured by this Instrument, Lender or Trustee shall release this Instrument in the manner described in Section 4 of the Note.

**SECTION 14.  SUBSTITUTE TRUSTEE; ACTION BY SINGLE TRUSTEE**.  Lender at Lender's option (but subject to approval by the Court, if required by the Court), may from time to time appoint additional or replacement trustees and may remove one or more trustees, from time to time, with notice to Receiver, by an instrument recorded in the city or county in which this Instrument is recorded.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred

upon Trustee herein.  Any Trustee, individually, may exercise all powers granted to Trustees collectively, without the necessity of the joinder of the other Trustees.

**SECTION 15.   REPRESENTATIONS OF RECEIVER**.  Receiver hereby represents and warrants to Lender the following:

(a)     <u>Enforceability of Instrument and Note</u>.  This Instrument has been duly executed and delivered by Receiver and constitutes valid and binding obligations of the Receivership Estate, enforceable in accordance with its terms.  Receiver has no right whatsoever against Lender other than the express contractual obligations of Lender set forth herein or in the Note.

(b)     <u>Commercial Purpose</u>.  The proceeds of the Loan will be used exclusively for commercial, business or investment purposes and the Real Property is not used principally for agricultural or farming purposes.

**SECTION 16.  RECEIVER'S ADDITIONAL COVENANTS**.  Receiver hereby covenants, agrees and undertakes as follows:

(a)     <u>Further Assurances</u>.  Receiver shall from time to time, at the request of Lender, promptly correct any defect, error or omission that may be discovered in the contents of this Instrument or in the execution or acknowledgment thereof.

(b)     <u>Compliance with Laws</u>.  Receiver shall maintain and keep (or cause to be maintained and kept) the Property in compliance with all applicable laws.

**SECTION 17.  NOTICE**.  Any notices, requests, demands, instructions or other documents to be given hereunder shall be in writing and delivered either in person, by facsimile, by email, by overnight courier, or by mail, and shall be deemed to have been duly given and to have become effective: (a) upon receipt if delivered in person or by facsimile or other electronic means, including by email; (b) one business day after having been delivered to an air courier for overnight delivery; or (c) three  business days after having been deposited in the U.S. mail as certified or registered mail, return receipt requested, all fees prepaid, directed to the parties or their assignees at the following addresses (or at such other address as shall be given in writing by a party hereto).

**SECTION 18.  GOVERNING LAW; DISPUTE RESOLUTION; SEVERABILITY**.  This Instrument shall be governed by the law of the jurisdiction in which the Property is located.  Notwithstanding anything in this Instrument to the contrary, the Court, having jurisdiction over Receiver and the Receivership Estate, shall have exclusive jurisdiction to resolve any and all disputes relating to the Property, including any dispute, claim or controversy arising out of or relating to the Note or this Instrument.  In the event that any provision of this Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Instrument or the Note that can be given effect without the conflicting provisions, and to this end the provisions of this Instrument and the Note are declared to be severable.

**SECTION 19.  TRANSFER BY LENDER**.  Lender may not, without the prior approval of the Court, at any time, sell, transfer or assign the Note and/or this Instrument.

**SECTION 20.  MISCELLANEOUS**.

(a)     <u>No Oral Change</u>.  No provision of this Instrument may be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Receiver

or Lender, except only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

(b)      Liability.  This Instrument secures an obligation only of the Receivership Estate in the Action, and is not a personal obligation of Receiver, its counsel, or any of the professionals engaged by Receiver pursuant to the terms of the Order, the July 27 Order or any subsequent orders of the Court. Notwithstanding anything in this Instrument to the contrary, Lender understands and agrees that (i) Receiver has been appointed by the Court as receiver in the Action, (ii) Receiver is not in the business of developing property, and (iii) Receiver has not developed or operated, and was not involved with any development or operation of the Property or the construction of any improvements on or off-site improvements related to the Property.  Receiver's duties as to the Property shall be pursuant to the Action, which shall be limited to those contemplated by the Order, the July 27 Order and any subsequent orders of the Court, until such time that the receivership is terminated by the Court.   Lender acknowledges and agrees that Receiver is not personally liable or responsible for any damages that Lender may suffer as the result of this transaction.   Lender further acknowledges and agrees that Receiver's liability for any such damages, if any, is limited to the assets of the Receivership Estate, that the receivership could be terminated at any time, and that Lender cannot recover any damages from Receiver upon termination of the receivership.  Lender further acknowledges that because the Property is in receivership and in the custody of the Receiver, Receiver acts at the direction of the Court, and only the Court which established the receivership and issued the Order shall have any jurisdiction over any dispute relating to the Property or to this Instrument.

(c)      Captions.  The captions and headings of the sections, paragraphs, and other provisions of this Instrument are for convenience only and are not to be used to interpret or define the provisions hereof.

(d)      Duplicate Originals; Counterparts.  This Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Instrument may be executed in multiple counterparts.

(e)      Number and Gender.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

(g)      Entire Agreement.   The Action, this Instrument and the Note constitutes the entire understanding and agreement between Receiver and Lender pertaining to the subject matter hereof and thereof.  Receiver hereby acknowledges that there are not, and were not, and no persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction that is the subject of the Note and this Instrument, except only to the extent expressly set forth therein and herein.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Receiver has executed this Instrument as of the day and year first above written.


**"RECEIVER":**


_____
Stephen J. Donell, Receiver



## ACKNOWLEDGMENT


| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF _____   )
COUNTY OF _____   )

On _____, 2019, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.


_____
Notary Public

## EXHIBIT A

### Legal Description of Real Property

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

THAT PORTION OF FRACTIONAL SECTION 34, TOWNSHIP 1 NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA. ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 3, 1897. DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34. DISTANT THEREON SOUTH 86°19' 39" EAST 480.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY BOUNDARY WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE. 50 FEET WIDE. AS DESCRIBED IN DEED TO THE CITY OF LOS ANGELES. RECORDED FEBRUARY 6. 1933 AS INSTRUMENT NO. 732, IN BOOK 12076 PAGE 35 OFFICIAL RECORDS. IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 1°47' 02" WEST 724.93 FEET: THENCE SOUTH 73° 11' 21" EAST 50.00 FEET; THENCE SOUTH 59° 48' 53" WEST 254.74 FEET; THENCE NORTH 43°121' 02" WEST 200.25 FEET; THENCE NORTH 11° 57' 02" WEST 6.81 FEET TO THE TRUE POINT OF BEGINNING: THENCE SOUTH 39°12' 54" EAST 147.75 FEET; THENCE NORTH 0° 47' 05" EAST 75.32 FEET; THENCE NORTH 39°12' 54" WEST 155.00 FEET; THENCE NORTH 11° 57' 02" WEST 40.55 FEET. THENCE NORTH 81° 02' 32" WEST 226.52 FEET TO A POINT DISTANT NORTHEASTERLY ALONG AS CURVE IN SAID EASTERLY LINE. CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 215.10 FEET. DISTANT OF 43.19 FEET FROM THE SOUTHWESTERLY END OF SAID CURVE. SAID CURVE BEING DESCRIBED IN SAID DEED AS HAVING A CENTER LINE RADIUS OF 245.10 FEET AND LENGTH OF 51.07 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE IN SAID EASTERLY LINE 43.19 FEET TO THE END THEREOF AND THE BEGINNING OF A TANGENT CURVE. CONCAVE SOUTHEASTERLY. HAVING A RADIUS OF 312.32 FEET; THENCE SOUTHWESTERLY LONG SAID TANGENT CURVE 155.75 FEET TO A POINT; THENCE LEAVING SAID EASTERLY LINE ALONG A RADIAL LINE OF LAST MENTIONED CURVE TO SAID POINT SOUTH 79° 13' 02" EAST 222.51 FEET; THENCE SOUTH 20°15" 12" EAST 22.00 FEET; THENCE NORTH 55° 35' 38" EAST 143.04 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM  THE FOLLOWING:

THAT PORTION OF FRACTIONAL SECTION 34, TOWNSHIP 1 NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 8, 1897, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34, DISTANT THEREON SOUTH 36° 19' 39" EAST 480.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY BOUNDARY WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE 30 FEET WIDE. AS DESCRIBED IN DEED TO THE CITY OF LOS ANGELES. RECORDED ON FEBRUARY 5, 1933. AS INSTRUMENT NO. 732. IN BOOK 12076 PAGE 33. OFFICIAL RECORDS. IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 1° 47' 02"

WEST 724.93 FEET; THENCE SOUTH 73° 11' 21" EAST 50.00 FEET; THENCE SOUTH 69°43 53" WEST 254.74 FEET; THENCE NORTH 43" 12' 02" WEST 200.25 FEET; THENCE NORTH 11° 57' 02" WEST 6.81 FEET; THENCE SOUTH 55° 35 38" WEST 143.04 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 20° 15' 12" WEST 10.00 FEET: THENCE NORTH 74° 25' 59" EAST 30.00 FEET: THENCE SOUTH 55° 35' 38" WEST 30.84 FEET TO THE TRUE POINT OF BEGINNING.

ALSO EXCEPT THAT PORTION OF FRACTIONAL SECTION 34, TOWNSHIP 1 NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES. COUNTY OF LOS ANGELES. STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 8, 1897. DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34, DISTANT THEREON SOUTH 88°19' 89" EAST 480.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY BOUNDARY WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE, 60 FEET WIDE, AS DESCRIBED IN DEED TO THE CITY OF LOS ANGELES, RECORDED ON FEBRUARY 8, 1933 AS INSTRUMENT NO. 732, IN BOOK 12076 PAGE 33, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 1° 47' 02" WEST 724.93 FEET; THENCE SOUTH 73° 11' 21" EAST 50.00 FEET; THENCE SOUTH 69°48 53" WEST 254.74 FEET; THENCE NORTH 43°12' 02" WEST 200.25 FEET; THENCE NORTH 11°5?' 02" WEST 6.81 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 55° 35' 38" WEST 74.00 FEET; THENCE NORTH 34°24'22" WEST 9.00 FEET; THENCE NORTH 56° 53'45" EAST 44.01 FEET; THENCE NORTH 53°40'58" EAST 30.02 FEET; THENCE SOUTH 34°24' 22" EAST 9.00 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES, LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID PROPERTY, BUT WITH NO RIGHT OF SURFACE ENTRY, WHERE THEY HAVE BEEN PREVIOUSLY RESERVED IN INSTRUMENTS OF RECORD.

PARCEL NO. 2:

AN EASEMENT AND RIGHT OF WAY FOR ROAD PURPOSES TO BE USED IN COMMON. WITH OTHERS ENTITLED TO THE USE THEREOF, IN, OVER, UNDER AND ACROSS THOSE PORTIONS OF FRACTIONAL SECTION 34, TOWNSHIP 1. NORTH, RANGE 15 WEST. SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES. COUNTY OF LOS ANGELES. STATE OF CALIFORNIA. ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE ON APRIL 8. 1897, DESCRIBED AS FOLLOWS:

(A) A STRIP OF LAND 20.00 FEET WIDE, LYING 10.00 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTER LINE: (A) A STRIP OF LAND 20.00 FEET WIDE, LYING 10.00 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTER LINE:

BEGINNING AT THE INTERSECTION OF THE NORTHERLY BOUNDARY OF SAID FRACTIONAL SECTION 34, WITH THE EASTERLY LINE OF BENEDICT CANYON DRIVE. 60 FEET WIDE, AS DESCRIBED IN THE DEED TO THE CITY OF LOS ANGELES, RECORDED ON FEBRUARY 8, 1983. AS INSTRUMENT NO. 732, IN BOOK 12076. PAGE 33. OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID EASTERLY LINE AS FOLLOWS:

SOUTHERLY ALONG A CURVE THEREIN, CONCAVE WESTERLY HAVING A RADIUS OF 200.00 FEET, A DISTANCE OF 64.31 FEET TO THE END THEREOF, AND TANGENT TO SAID CURVE SOUTH 2°47' 58" EAST 68.24 FEET TO THE TRUE POINT OF BEGINNING, THENCE LEAVING SAID EASTERLY LINE SOUTH 80° 16' 26" EAST 15.73 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 60.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE 59.96 FEET; THENCE TANGENT TO SAID CURVE SOUTH 23° 00' 44" EAST 52.42 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 200.00 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE 49.37 FEET; THENCE TANGENT TO SAID CURVE SOUTH 8° 52' 12" EAST 75.35 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 200.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE 58.69 FEET; THENCE TANGENT TO SAID CURVE SOUTH 7°22'10" WEST 150.34 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE EASTERLY, HAVING A RADIUS OF 200.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE 67.44 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE 90.78 FEET; THENCE TANGENT TO SAID CURVE SOUTH 43°12' 02" EAST 137.12 FEET TO A POINT TO BE KNOW AS POINT "A" FOR PURPOSES OF THIS DESCRIPTION. THE NORTHERLY SIDE LINE OF SAID STRIP OF LAND AT ITS NORTHERLY END, TO BE EXTENDED WESTERLY, SO AS TO TERMINATE IN SAID EASTERLY LINE OF BENEDICT CANYON DRIVE.

(B) BEGINNING AT A POINT "A" ABOVE DESCRIBED: THENCE NORTH 46°47'58" EAST 10.00 FEET TO THE BEGINNING OF A CURVE, CONCAVE NORTHEASTERLY. HAVING A RADIUS OF 15.00 FEET (A RADIAL LINETO CURVE AT SAID BEGINNING OF CURVE BEARS SOUTH 46° 47' 53" WEST); THENCE SOUTHEASTERLY ALONG SAID CURVE 8.79 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 15.00 FEET; THENCE SOUTHEASTERLY, SOUTHERLY, SOUTHWESTERLY, WESTERLY, AND NORTHWESTERLY ALONG SAID CURVE 64.89 FEET TO THE BEGINNING OF A REVERSE CURVE, CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 15.00 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE 8.79 FEET TO A POINT DISTANT SOUTH 45° 47' 58" WEST 10.00 FEET FROM SAID POINT "A"; THENCE NORTH 46° 47' 58" EAST 10.00 FEET TO SAID POINT "A".

APN: **4382-001-023**