KATHY BAZOIAN PHELPS (155564)
*kphelps@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone:  (310) 651-2997

Christopher D. Sullivan (148083)
*csullivan@diamondmccarthy.com*
Karen K. Diep (305587)
*kdiep@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Telephone: (415) 692-5200

*Counsel for Stephen J. Donell,*
*Liquidating Receiver*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ALLIEDWALLET, INC., ET AL.,<br><br>Defendants. | Case No. 2:19-cv-04355-SVW-E<br><br>***EX PARTE* MOTION FOR ORDER (1) APPROVING RECEIVER'S PROPOSED FORM AND MANNER OF NOTICE TO PARTIES TO THE ACTION AND THE PUBLIC; (2) CONFIRMING SALE PROCEDURES; (3) APPROVING STALKING HORSE BID; (4) APPROVING FORM OF NOTICE OF CONFIRMATION OF SALE; AND (5) EXTENDING DURATION OF RECEIVERSHIP**<br><br>**Date:**   [No Hearing Set]<br>**Time:**<br>**Place:** |

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF RELIEF REQUESTED ...............1

    A.   **Grounds For *Ex Parte* Relief** ...................................................................2

II.     RELEVANT FACTUAL BACKGROUND ........................................................3

    A.   **Procedural History** .......................................................................3

    B.   **Marketing Activities** ....................................................................5

    C.   **The Stalking Horse Purchase Agreement** .................................6

III.    PROPOSED AUCTION, SALE PROCEDURES AND SALE NOTICE........8

    A.   **Proposed Disbursements and Timing of Final Account**...............11

IV.     ARGUMENT ...............................................................................................12

    A.   **The Court's Broad Supervisory Powers and Discretion in Federal Receiverships** ...............................................................12

    B.   **The Sale of the Real Property Is Appropriate** ..................13

        1.   **Appointment of Three Appraisers** ...........................14

        2.   **Private Sale Must Be For a Price At Least Two-Thirds the Amount of the Average of the Appraised Values**...........16

        3.   **Publication of Notice of Proposed Private Sale Once at Least Ten Days Prior to Confirmation** ...................16

        4.   **The Private Sale to the Proposed Purchaser Shall Be Confirmed Because No Higher Bid Has Been Received** .......16

    C.   **Sale of Personal Property is Appropriate** .............................17

V.      TAX WITHHOLDING OBLIGATIONS HAVE BEEN MET ......................18

VI.     EXTENSION RE DURATION OF RECEIVERSHIP ..................................18

VII.    LOCAL CIVIL RULE 7-19 AND COURT'S PROCEDURES FOR EX PARTE APPLICATIONS ........................................................................19

VIII.   CONCLUSION ...........................................................................................21

1

# **TABLE OF AUTHORITIES**

**CASES**

*Bidwell v. Huff,*
    176 F. 174 (5th Cir. 1909) ......................................................................... 14

*CFTC v. Topworth Int'l, Ltd.,*
    205 F.3d 1107 (9th Cir. 1999) .................................................................... 12

*Cumberland Lumber Co. v. Tunis Lumber Co.,*
    171 F. 352 (4th Cir. 1909) ......................................................................... 14

*Pewabic Mining Co. v. Mason,*
    145 U.S. 349 (1891) ................................................................................... 14

*SEC v. Black,*
    163 F.3d 188 (3rd Cir. 1998) ..................................................................... 14

*SEC v. Capital Consultants, LLC,*
    397 F.3d 733 (9th Cir. 2005) ..................................................................... 12

*SEC v. Elliot,*
    953 F.2d 1560 (11th Cir. 1992) ................................................................. 14

*SEC v. Hardy,*
    803 F .2d 1034 (9th Cir. 1986) ............................................................ 12, 14

*SEC v. Wenke,*
    622 F.2d 1363 (9th Cir. 1980) ................................................................... 12

*Sun Protection Co. v. United States,*
    391 U.S. 966, 88 S. Ct. 2034 (1968) ......................................................... 13

*United States v. Branch Coal Corp.,*
    390 F. 2d 7 (3rd Cir. 1968), *cert. den.* 390 F.2d 7 (1968) ......................... 13

**STATUTES**

28 U.S.C. § 2001 ............................................................................................... 3

**RULES**

Local Civil Rule 7-19 ...................................................................................... 19

Stephen J. Donell, the Court-appointed liquidating receiver (the "Receiver") of (a) real property located in the city of Los Angeles, county of Los Angeles, state of California, commonly known as 3100 Benedict Canyon Drive, Beverly Hills, California 90210-1033, Parcel Number 4382-001-023 (the "Benedict Canyon Real Property" or the "Property"), and (b) all furnishings and other personal property purchased for and/or located at the Benedict Canyon Real Property (collectively, the "Receivership Property"), pursuant to the Stipulated Final Order for Permanent Injunction and Monetary Judgment against Ahmad ("Andy") Khawaja, AlliedWallet, Inc., Allied Wallet, Ltd., GTBill, LLC, and GTBill Ltd. issued on June 7, 2019 [Doc No. 30] ("Receiver Order"), hereby moves for an order (1) confirming sale procedures; (2) approving stalking horse bid; (3) approving the form of notice of confirmation of the sale; and (4) extending the duration of the receivership.

## I.   INTRODUCTION AND SUMMARY OF RELIEF REQUESTED

The Receiver respectfully requests that this Court enter an Order as follows:

1. Approving the Receiver's proposed sale procedures for the sale and conduct of an auction where Qualified Bidders may submit overbids in the form of Qualified Bids for the purchase of the Bel Air Property, as those procedures are set forth in the Sale Notice attached as Exhibit "1" ("Sale Procedures"); and

2. Approving the Stalking Horse Purchase Agreement, a copy of which is attached hereto as Exhibit "2," subject to overbidding and subsequent Court confirmation pursuant to the approved Sale Procedures.

3. Authorizing the filing of a second ex parte application to approve the sale of the Receivership Property on substantially the same terms to the highest and best bidder resulting from the overbid procedure set forth above.

4. Extending the deadline for the Receiver to file his Final Report and Account for approximately 3 months to March 31, 2020.  The appeals period on an order approving a sale, whether the order is obtained on regular notice or on an ex parte

- 1 -

basis, will be 60 days pursuant to F.R.A.P. 4. The Receiver believes that the title company may not agree to close the sale during the appeals period, which will make it impossible for the Receiver to close the sale and file a Final Report and Account by the presently set deadline of December 7, 2019, even if the *ex parte* relief is granted as requested herein. The Receiver therefore requests authority to extend that deadline to allow sufficient time for the sale to close.

### A. Grounds For *Ex Parte* Relief

The Receiver has sought this relief on an *ex parte* basis because of the urgent need for the Receiver to complete the sale of the Receivership Property in light of (a) the significant interest and charges accruing on the liens encumbering the Property and the nearly $50,000 monthly cost of carrying the Property pending a sale; and (b) the Court's and parties' interest in closing the receivership as quickly as possible. If the Receiver waits the required time required to file and have a noticed motion heard by the Court on regular notice, the Receiver will be delayed in conducting an auction by at least 30 days. After then waiting an additional at least 10 days to publicize and conduct the auction, the Receiver would be required to wait another 30 days following the auction to have a second motion heard on regular notice confirming the sale to the highest bidder. This delay would cost the estate at approximately $150,000. Given the extensive marketing that has been done of the Property and the strength of the stalking horse bid that is at a price of $500,000 over the listing price of $15 million, the Receiver believes that no party will be prejudiced by the *ex parte* request for relief from the ongoing carrying costs.

Rather, the Receiver believes that an expedited process to approve the sales procedures and confirm the sale will benefit the parties by (a) allowing the secured creditors to be promptly paid; (b) significantly mitigating the costs to the estate by eliminating about three months of carrying costs; and (c) expediting the resolution

of the FTC proceedings in obtaining the delivery of sales proceeds pursuant to the stipulation between the parties. Additionally, prospective buyers will not be harmed as they will still receive the requisite 10 days of opportunity to overbid for the Receivership Property as set forth in Rule 2001(b).

## II.    RELEVANT FACTUAL BACKGROUND

### A. Procedural History

1.      On June 7, 2019, this Court entered the Stipulated Final Order for Permanent Injunction and Monetary Judgment against Ahmad ("Andy") Khawaja, AlliedWallet, Inc., Allied Wallet, Ltd., GTBill, LLC, and GTBill Ltd. issued on June 7, 2019 [Doc No. 30] ("Receiver Order"), appointing Stephen J. Donell as the liquidating receiver of (a) real property located in the city of Los Angeles, county of Los Angeles, state of California, commonly known as 3100 Benedict Canyon Drive, Beverly Hills, California 90210-1033, Parcel Number 4382-001-023 (the "Benedict Canyon Real Property" or the "Property"), and (b) all furnishings and other personal property purchased for and/or located at the Benedict Canyon Real Property (collectively, the "Receivership Property").

2.      The Receiver Order was the result of a stipulation by defendants Andy Khawaja, AlliedWallet, Inc., Allied Wallet, Ltd., GTBill, LLC, and GTBill Ltd. by which defendant Khawaja voluntarily gave up his interest in the Receivership Property to be liquidated and the proceeds turned over to plaintiff Federal Trade Commission toward satisfaction of his obligations under the Stipulated Judgment.

3.      The Receiver has been granted the full powers of an equity receiver over the Receivership Estate.  (Receiver Order, Section X.)  In addition, among other things, the Receiver Order provides that the Receiver must "preserve and protect such assets by undertaking necessary repairs, procuring appropriate insurance, and making required payments for taxes, insurance, assessments, reasonable and necessary maintenance, and any other actions necessary to efficiently manage the assets and

- 3 -

maintain their value" and liquidate the assets of the Receivership Estate.  (Receivership Order Section X.B. and C.)  In liquidating the assets of the Receivership Estate, the Receiver shall do so "at reasonable costs and in a commercially reasonable fashion." (Receivership Order Section X.D.)

4.     The Receiver Order directs the Receiver to market and sell the Receivership Property and file a final report and accounting within six months of the Receiver's appointment, unless the deadline is extended.  (Receiver Order, Sections X.B and X.C.)

5.     The receivership estate consists solely of the tangible assets comprising the real and personal property related to the Benedict Canyon Real Property.  There is no cash or other liquid assets in the receivership estate, which is comprised solely of the real and personal property associated with the Benedict Canyon Real Property. The only source of funding to pay for the maintenance and other essential expenses to preserve the Receivership Property is funds borrowed on a priority basis pursuant to prior order of this Court. The Receiver previously obtained authority to borrow up to $400,000 on a priority basis from SVR Capital Trust ("SVR") to pay for insurance, to pay for maintenance and preservation expenses for the upkeep of the Receivership Property until it can be sold, and to pay the more than $33,000 per month mortgage payment due Wells Fargo Bank, N.A., the holder of the first deed of trust on the Benedict Canyon Real Property. The deed of trust secures a note in the original principal sum of $8,250,000. To date, the Receiver has borrowed $300,000 pursuant to the Order entered on June 26, 2019. [ECF 38].

6.      The cost to preserve and protect the Receivership Property is approximately $50,000 per month. The Receiver has been aggressively marketing the Benedict Canyon Real Property and has obtained multiple offers for the Property.

7.     The Court previously approved some of the procedures by which the Receiver could comply with portions of 28 U.S.C. § 2001(b) for a private sale,

- 4 -

specifically relating to the appraisals needed. In the Court's June 26, 2019 Order, the Court authorized the use of two appraisals and a broker's opinion of value to satisfy Rule 2001(b). The Court has not yet directed the form of publication or overbid process as may be required under Rule 2001(b), which is the subject of the within Motion.

**B.  Marketing Activities**

8.     The Receiver engaged a real estate broker to list the Benedict Canyon Real Property in a commercially reasonable fashion.  The Receiver has employed Philip Seymour and Keller Williams (the "Broker") as the broker to list, market and solicit offers to purchase the Benedict Canyon Drive Property.

9.     The Broker extensively advertised the Receivership Property for sale beginning August 28, 2019.  See Declaration of Philip Seymour.  The Receivership Property was listed for sale on the Multiple Listing Service ("MLS") beginning on August 28, 2019.  A copy of the marketing material for the Property is attached to the Seymour Declaration of as Exhibit "4."

10.     The Broker prepared and distributed information sheets for the Property through an extensive list of contacts by e-mail and published notices in the MLS Open House Guide with full color, full page advertisements for the Property.  The Broker sent targeted solicitations to lists of potential buyer contacts, real estate agents, investors, real estate developers, and builders who might have an interest in the Property.  The Property was advertised on numerous real estate web sites, including www.theseymourgroup.com.  These web sites in turn are connected with hundreds of others where the advertisements could be viewed.  The Broker published a full page color ad in the MLS Broker Caravan Open House Guide.  The internet site advertisements included color photographs of the property with details regarding the lot and focused on the unique opportunity to acquire this beautiful residential property.  The Broker's advertisement efforts were extensive and the analytics of those efforts reveal that the Property was exposed to the following audience:

a.  1,200 website visits in 5 days

b.  60,000 Facebook impressions

c.  11,000 Instagram impressions

d.  100,000+ video views

e.  98 international MLS portals

f.  92 domestic real estate publishers

g.  153 Property clicks on World Property Journal

h.  114 media publications

i.  70,000 emailed realtors

j.  21 million potential viewers globally.

11.  The Broker received 36 inquiries and requests for more detailed information regarding the Receivership Property.  The Broker conducted nine site visits with prospective purchasers during the marketing period and received four written offers to purchase the property.  *See* Seymour Decl.

12.  The Broker advised each of the prospective buyers from whom he received offers that multiple offers had been received for the Property, and each prospective buyer was invited to make their highest and best offer by a date and time certain.

13.  The Receiver now seeks to comply with Rule 2001(b) by publishing notice of the terms of the sale and offering interested purchasers an opportunity to overbid in an amount that is at least 10% higher than the highest offer he has received to date.

**C. The Stalking Horse Purchase Agreement**

14.  Prior to marketing the Receivership Property, the Receiver obtained a broker's opinion and value and two appraisals so that he could complete a sale of the property by private sale, which requires the appointment of three appraisers by the Court under 28 U.S.C. § 2001(b). Under the Receiver Order, Section X.D.2, one of

- 6 -

the appraisals can be satisfied by a realtor's marketing analysis, which the Receiver obtained from the real estate broker engaged to sell the Benedict Canyon Real Property.

15.     The interest generated by the extensive marketing efforts resulted in the Receiver obtaining multiple offers for the Property.  The Receiver selected the highest and best offer received based on the Receiver's judgment, including price, terms and ability to perform. The Receiver ultimately negotiated a proposed Stalking Horse Purchase Agreement, a copy of which is attached as Exhibit "2" to the Donell Declaration.  Without modifying in any respect the express terms of the Stalking Horse Purchase Agreement, the principle terms are summarized as follows:

a. Purchase price of $15,050,000, which is comprised of $14,992,810 for the real property and $57,190 for the Personal Property;

b. The effective date of the Stalking Horse Purchase Agreement is October 3, 2019;

c. Sale of the Property is "As Is" as detailed in Article 7 of the Stalking Horse Purchase Agreement;

d. Earnest money deposit of $465,000 has been paid;

e. All contingencies were removed on November 2, 2019;

f. Closing is to occur thirty days after the Court confirms the sale of the Property to the Buyer under the Stalking Horse Purchase Agreement or to the High Bidder based on the Qualified Bid submitted at the auction determined by the Receiver to be the highest and best offer to the Property pursuant to the sale procedures approved by the Court;

g. Broker's Commission, pursuant Article 13 of the Stalking Horse Purchase Agreement, the Broker's Addendum to the Stalking Horse Purchase Agreement and the Marketing Order, shall be 3.85% of the

EX PARTE MOTION TO CONFIRM SALE PROCEDURES

Gross Purchase Price;

h. The sale shall be subject to an auction and overbid process as set forth in Section 14 of the Stalking Horse Purchase Agreement;

i. Transfer of Title by Receiver's Deed in the form attached as Exhibit B to the Stalking Horse Purchase Agreement

16. The Stalking Horse Purchase Agreement explicitly contemplates and requires that the Receiver conduct an auction to provide the opportunity for overbids to be submitted for the purchase of the Property. Section 14 of the Stalking Horse Purchase Agreement details the sale procedures for the overbidding and conduct of the auction that the Receiver recommends to the Court and asks the Court to approve through this Motion. The sale procedures are detailed below.

## III.   PROPOSED AUCTION, SALE PROCEDURES AND SALE NOTICE

17. The Receiver seeks approval of procedures to sell the Property at auction to the High Bid submitted by a Qualified Bidder at the auction or to the Buyer under the Stalking Horse Purchase Agreement if there are no Qualified Bidders who submit overbids at the auction. Any sale will be subject to Court confirmation pursuant to 28 U.S.C. § 2001(b). The sale procedures proposed by the Receiver are detailed in Section 14 of the Stalking Horse Purchase Agreement and set forth separately for Court approval in Exhibit "1" to the Donell Declaration ("Sale Procedures"). The Sale Procedures are summarized in material respects as follows:

a. The Receiver will schedule a date to conduct an auction for the sale of the Property to be held at the Receiver's offices on a date to be determined following at least 10 days after notice is first provided pursuant to the Sale Notice and from the date of publication, whichever is longer.

b. Only Qualified Bidders who have submitted Qualified Bids shall be entitled to participate and bid at the auction;

- 8 -
EX PARTE MOTION TO CONFIRM SALE PROCEDURES

c.     The auction shall begin with the Starting Bid of $15,050,000.00 reflected in the Stalking Horse Purchase Agreement;

d.     The Initial Overbid from a Qualified Over Bidder shall be in the minimum amount of $16,555,000;

e.     Each bid subsequent to the Initial Overbid shall be at least $100,000 greater than the preceding bid amount ("Incremental Bid Amount");

f.     Bidding shall continue until the Receiver concludes the Auction of the Property and determines, in his discretion, what is the highest and best bid for the purchase of the Property received from Qualified Bidders (the "Successful Bidder");

g.     Qualified Bidders who have submitted an overbid may elect to have their bid serve as a Back Up Bid;

h.     The Receiver will not be deemed to have accepted a bid at the auction until the bid has been approved by the Court and the sale confirmed on a subsequent *ex parte* application by the Receiver;

i.      No bids may be tendered or accepted after the conclusion of the auction, and the Receiver retains discretion in the conduct of the auction, including without limitation the right to postpone or cancel the auction;

j.     Prospective bidders must qualify to bid pursuant to the Sale Procedures by, among other things, executing a Purchase and Sale Agreement and Joint Escrow Instructions not materially more burdensome to the Receiver or the Receivership estate than the Stalking Horse Purchase Agreement, is not subject to any financing or due diligence contingencies or other material conditions precedent to the bidder's obligation to close and acceptable to the Receiver, providing

- 9 -
EX PARTE MOTION TO CONFIRM SALE PROCEDURES

proof of funds sufficient to fund the bidder's proposed purchase of the property, and an earnest money deposit of $465,000 by cashier's check or wire transfer.  Unless otherwise determined by the Receiver, prospective bidders must meet the qualification requirements no later than three business days prior to the Bid Deadline, which will be set based on the date of the auction;

> k.     The Receiver shall file an *ex parte* application for Court confirmation of the sale to the Successful Bidder after the auction, whether pursuant to the Stalking Horse Purchase Agreement or a purchase agreement with a higher Successful Bidder.

18.     The Receiver also requests that the Court approve the form and manner of notice of the auction to be provided by the Receiver.  The Receiver proposes that the auction sale be scheduled for a date that is at least 10 days after service by mail of the notice of the sale, in the form attached as Exhibit "1" to the Donell Declaration ("Sale Notice"), or 10 days following publication in a newspaper, whichever is longer. The Sale Notice will be served by mail on all parties to this action, and notice of the date of the auction and contact information will be published at least 10 days in advance of the auction in the *Los Angeles Times*.  In addition, the Receiver requests that he and his Broker be given the discretion to also provide notice of the auction sale by electronic mailing of the Sale Notice and other means, including publication of the Sale Notice on the Broker's web sites.

19.     The Receiver contends the Sale Procedures in the Sale Notice will provide a full and fair opportunity to maximize value from the sale of the Property. The Sale Procedures provide for notice to the public and to likely potential over bidders, and the proposed Sale Notice will provide fair notice to the parties to the action of the auction date.  The bid qualification procedures and requirements in order for bidders to participate in the auction are reasonable under

- 10 -

the circumstances and place bidders on similar financial and other footing as the Buyer under the Stalking Horse Purchase Agreement

### A. Proposed Disbursements and Timing of Final Account

20. The Receiver intends to make the following disbursements from escrow at the time of closing of the sale:

    a. All ordinary costs of sale, escrow fees, commissions, charges and real property taxes;

    b. Reimbursement of amounts advanced under Receiver Certificates;

    c. All amounts on the liens held by Wells Fargo Bank and SVR Capital Trust as described below;

    d. All remaining net funds shall be disbursed to the Receiver to hold for the benefit of the Federal Trade Commission ("FTC) following payment of customary tax obligations in connection with the sale of the Property, professional fees, and any other actual or anticipated fees or costs to be incurred prior to the close of the receivership.

21. The Preliminary Title Report for the Benedict Canyon Property is attached to the Donell Declaration as Exhibit "3." As set forth therein, the liens against the Property that will be paid through escrow are as follows:

    a. The Deed of Trust in favor of Wells Fargo Bank, N.A., in the principal amount of $8,525,000, dated August 5, 2017, Doc. No. 20170893980.

    b. The Deed of Trust in favor of SVR Capital Trust, in the principal amount of $400,000, dated June 28, 2019, Doc No. 2019-657748.

22. The Receiver has been directed in the Receiver Order to file a final report and accounting within six months of his appointment on June 7, 2019, or by December 7, 2019, unless the time is extended. If the sale is approved pursuant to this Motion and timely closes, the Receiver anticipates that he should be in a position to

EX PARTE MOTION TO CONFIRM SALE PROCEDURES

file his Final Report and Account in early December 2019, which he will endeavor to do. The distribution of the net proceeds to the FTC will be made upon court approval of the Final Report and Account and payment of all outstanding fees and costs and any reserves that may be required to close the case. In the event of a delay in the closing of a sale, the Receiver intends to file a motion seeking to extend the deadline to allow for a sale to close and to make final distributions.

## IV.  ARGUMENT

### A.  The Court's Broad Supervisory Powers and Discretion in Federal Receiverships

"The power of a district court to impose a receivership or grant other forms of ancillary relief . . . derives from the inherent power of a court of equity to fashion effective relief." *SEC v. Wenke*, 622 F.2d 1363, 1369 (9th Cir. 1980). The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F .2d 1034, 1038 (9th Cir. 1986). To that end, district courts have broad powers to determine what is necessary for the administration and supervision of an equity receivership. *See SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005).  As the Ninth Circuit explained:

> A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. The district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.

*Id.* (emphasis added; citations omitted); see also *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the [district]

court's supervisory role and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership for the benefit of creditors.").

Accordingly, this Court has broad powers and wide discretion to grant the Receiver the practical relief he requires in order to fulfill his duties under the Receiver Order which are sought in the Motion.

## B.   The Sale of the Real Property Is Appropriate

The Receivership Estate consists of the Benedict Canyon Real Property and related personal property.  Title 28 U.S.C. § 2001 sets forth the procedures pertaining to the sale of real property. Subsection (a) pertains to procedures for the public sale of real property and provides for the sale of real property by public sale at the courthouse where the Receiver was first appointed, at the courthouse where most of the property is located or at such other premises as the Court directs.  28 U.S.C. § 2001(a).  Section § 2001(b) of title 28 pertains to the sale of real property at private sale.  That statute provides in part:

> After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest therein by private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be served thereby.

The time, manner, terms of sale and notice thereof are regulated by the court appointing the receiver.  Courts are granted discretion in setting the terms and conditions for judicial sales and the Court's discretion will not be disturbed on appeal except where abuse of discretion is shown.  *United States v. Branch Coal Corp.*, 390 F. 2d 7 (3rd Cir. 1968), *cert. den. Sun Protection Co. v. United States*, 391 U.S. 966, 88 S.

Ct. 2034 (1968).  The Court has substantial discretion in receivership matters in setting the overbidding procedures applicable to sales of real property.  *See Pewabic Mining Co. v. Mason*, 145 U.S. 349, 356 (1891) (the provisions for notice and other conditions shall be determined by the Court "as will in his judgment best protect the rights of all interested, and make the sale most profitable to all").  *See also Cumberland Lumber Co. v. Tunis Lumber Co.*, 171 F. 352 (4th Cir. 1909); *Bidwell v. Huff*, 176 F. 174 (5th Cir. 1909).  The terms and conditions of the judicial sale that the Court may adopt are based on the facts and circumstances of each case.  The discretion granted in connection with sales of assets is consistent with the broad discretion accorded to the Court sitting in equity in receivership proceedings to make orders concerning the administration and supervision of the estate that will promote equity, efficiency and cost-effectiveness in the estate's administration.  *See generally Securities and Exchange Commission v. Hardy*, 803 F.2d 1034 (9th Cir. 1986); *Securities and Exchange Commission v. Black,* 163 F.3d 188, 199 (3rd Cir. 1998); *Securities and Exchange Commission v. Elliot*, 953 F.2d 1560 (11th Cir. 1992).

There are four statutory components for the approval of a private sale under § 2001(b).  Each of these four components will be addressed below by providing the Court the text of the statute followed by an explanation of how the Receiver's proposed sale procedures meet or vary the component.

### 1.     Appointment of Three Appraisers

Section 2001b) of Title 28 states:

> Before confirmation of any private sale, the court shall
> appoint three disinterested persons to appraise such property
> or different groups of three appraisers each to appraise
> properties of different classes or situated in different
> localities.

- 14 -
EX PARTE MOTION TO CONFIRM SALE PROCEDURES

The Receiver Order provides that, "The Court approves the use of a realtor's marketing analysis as one of the three appraisals required by 28 U.S.C. § 2001(b)." The statute does not define what constitutes an "appraisal" for the purpose of § 2001(b). The Receiver has obtained his Broker's market analysis which formed the basis of the list price of $15 million. The Receiver has additionally obtained two formal appraisals which are both not more than 10% higher than the Stalking Horse offer. The Receiver has not submitted the appraisals in connection with this Motion so that the disclosure of the appraisal valuations does not impact the sales and auction process. The Donell Declaration attests to the fact that the Receiver has complied with the valuation requirements of Rule 2001(b). Although the actual appraisals or valuation figures have not been included in the Declaration, the Receiver is prepared to provide that documentation and information to the Court for *in camera* review if necessary. The valuations by both the local real estate Broker and the appraisers are well within the requirements of Rule 2001(b) as compared to the opening offer of $14,992,810 for the real property. The valuations are based on comparable sales data and the experience and knowledge of the sales agent and appraisers who actually deal in real estate in the local market and thus are reliable indicators of the actual value likely to be realized from the marketing and sale of the Property. Additionally, the fact that the Receivership Property has been exposed to the marketplace itself for lengthy periods of time, which provides a real-world valuation of the Property based on the response of potential buyers.  The clear purpose of this provision is to obtain a reliable indication of the value of the property to be sold to ensure that the property is not being sold for an unreasonably low price.  The valuations obtained coupled with the exposure to the market and the opportunity for interested buyers to submit bids provides ample assurance to the Court that the best price for the property is being realized under the circumstances.

- 15 -

EX PARTE MOTION TO CONFIRM SALE PROCEDURES

**2.      Private Sale Must Be For a Price At Least Two-Thirds the Amount of the Average of the Appraised Values**

Section 2001(b) next provides, "No private sale shall be confirmed at a price less than two-thirds of the appraised value." The sale to the Proposed Buyer at $14,992,810 well exceeds the minimum threshold for the price that must be achieved for a private sale in relation to the valuations of the Property submitted by the Receiver.  The current offer, which exceeds the listing price and is within two-thirds of the appraised value, satisfies this component of the statute.

**3.      Publication of Notice of Proposed Private Sale Once at Least Ten Days Prior to Confirmation**

Section 2001(b) then provides:

> Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation.

The Receiver proposes to publish in the *Los Angeles Times* a notice of his intention to conduct an auction of the Property no sooner than 10 days following the date of publication.  The Receiver proposes to publish the notice one time so this component of the statute is satisfied without modification.

**4.      The Private Sale to the Proposed Purchaser Shall Be Confirmed Because No Higher Bid Has Been Received**

The last of the four components of the private sale provisions of § 2001(b) is as follows:

> The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which

- 16 -
EX PARTE MOTION TO CONFIRM SALE PROCEDURES

> guarantees at least a 10 per centum increase over the price
> offered in the private sale.

The effect of this provision is that the Court is authorized to confirm the private sale so long as the Receiver sells the Property to the current Proposed Buyer or the Backup Buyer. No overbid has yet been made that is 10 percent over the current offer of $14,992,810. The Receiver proposes to conduct a private auction and to set the initial overbid increment at 10% higher than the current offer for both the real and personal property. If no overbid offers are received, then the Receiver intends to request that the Court confirm the $15,050,000 Stalking Horse Purchase Agreement. If a higher and better offer is obtained, then the Receiver will seek Court confirmation of the successful bidder.

### C. Sale of Personal Property is Appropriate

Section 2004 of Title 28 provides for the sale of personal property in the same manner as real property, "unless the court orders otherwise."  The Receiver requests that the Court "order otherwise" in this case on the ground that allowing the Receiver to sell the Personal Property by private sale, without the expense of engaging multiple appraisers or other valuation experts and publishing notice of the proposed sale is appropriate under the circumstances.  The furniture and furnishings are of limited, modest value, and the administrative expenses associated with obtaining multiple valuations would materially reduce the estate's net recovery.

The Receiver has obtained a valuation of the Personal Property from an auctioneer, who assesses the value at $57,190. The portion of the Purchase Price in the Stalking Horse Purchase Agreement is $57,190. The Personal Property has limited auction value as used furniture, and the sale price for the Personal Property equals or exceeds the likely auction value.  The expense of removing and storing the Personal Property would also significantly limit the net recovery to the estate.  The sale of the

Personal Property for $57,190 to the Proposed Buyer eliminates those expenses and would result in a sale at or above the likely estimated auction value.

## V. TAX WITHHOLDING OBLIGATIONS HAVE BEEN MET

The Receiver is informed and believes that the beneficial owners of the Park Ridge Trust are not owned by any foreign interests. Accordingly, the Receiver and the Buyer believe that no withholding is required and the Receiver is prepared to sign the FIRPTA Affidavit attached to the Stalking Horse Purchase Agreement as Exhibit "D." The Buyer has requested that the Order approving the sale contain the following language, which the Receiver believes is appropriate and requests authority to sign by the this Ex Parte Motion: "All parties have satisfied the requirements to eliminate withholding tax under any California state or local law (or any comparable provision of U.S. federal law, including Section 1445 of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder) with respect to the purchase and sale of the Property. In so doing, each party has reasonably relied on the statements of, or forms prepared by, other parties."

## VI. EXTENSION RE DURATION OF RECEIVERSHIP

The Receiver requests that the Court enter an order extending the deadline for the Receiver to file his Final Report and Account for approximately 4 months to March 31, 2020.  The appeals period on an order approving a sale, whether the order is obtained on regular notice or on an ex parte basis, will be 60 days pursuant to F.R.A.P. 4. The Receiver believes that the title company may not agree to close the sale during the appeals period, which will make it impossible for the Receiver to close the sale and file a Final Report and Account by the presently set deadline of December 7, 2019, even if the *ex parte* relief is granted as requested herein. The Receiver therefore requests authority to extend that deadline to allow sufficient time for the sale to close.

- 18 -
EX PARTE MOTION TO CONFIRM SALE PROCEDURES

## VII.   LOCAL CIVIL RULE 7-19 AND COURT'S PROCEDURES FOR *EX PARTE* APPLICATIONS

This *ex parte* application is made pursuant to Local Civil Rule 7-19 and the Court's published procedures for *ex parte* applications.

Copies of this *ex parte* application have been served on the parties to this action through their counsel concurrently with the filing of these papers with the Court as well as on counsel for Wells Fargo.  In addition, the Receiver through his counsel has made good faith efforts to provide telephonic notice of the filing of this *ex parte* application, and of the Court's requirements that responses to an *ex parte* application be filed by 3:00 p.m. on the first business day following the date of service of the application.  The Receiver is advised that plaintiff FTC does not oppose the motion and relief sought. The Receiver's counsel has not been advised of the position any of the defendants have on the motion, other than defendant Mohammad Diab who has no objection to the application.

Telephonic notice of the *ex parte* application with that information as well as written notice has been provided to the following as reflected in the Declaration of Karen K. Diep:

| Party and Counsel, If Applicable | Address | Telephone Number and Email Address |
|---|---|---|
| *Plaintiff:* Federal Trade Commission<br>*Counsel*:<br>    Andrew S. Hudson<br>    Karen S. Hobbs<br>    Delilah Vinzon | 600 Pennsylvania Avenue NW CC-8528 Washington, DC 20580<br><br>10990 Wilshire Blvd., Suite 400, Los Angeles, CA 90024 | 202-326-2213<br>202-326-3587<br>ahudson@ftc.gov<br>khobbs@ftc.gov<br>dvinzon@ftc.gov |

EX PARTE MOTION TO CONFIRM SALE PROCEDURES

| Party and Counsel, If Applicable | Address | Telephone Number and Email Address |
|---|---|---|
| *Defendant:* AlliedWallet, Inc.<br>*Counsel*:<br>    Matthew Marshall Gurvitz<br>    VENABLE LLP | 2049 Century Park East<br>Suite 2300<br>Los Angeles, CA 90067 | 310-229-9900<br>mmgurvitz@venable.com |
| *Defendant:* Allied Wallet, Ltd.<br>*Counsel*:<br>    Matthew Marshall Gurvitz<br>    VENABLE LLP | 2049 Century Park East<br>Suite 2300<br>Los Angeles, CA 90067 | 310-229-9900<br>mmgurvitz@venable.com |
| *Defendant:* GTBill, LLC<br>*Counsel*:<br>    Matthew Marshall Gurvitz<br>    VENABLE LLP | 2049 Century Park East<br>Suite 2300<br>Los Angeles, CA 90067 | 310-229-9900<br>mmgurvitz@venable.com |
| *Defendant:* GTBill, Ltd.<br>*Counsel*:<br>    Matthew Marshall Gurvitz<br>    VENABLE LLP | 2049 Century Park East<br>Suite 2300<br>Los Angeles, CA 90067 | 310-229-9900<br>mmgurvitz@venable.com |
| *Defendant:* Ahmad Khawaja<br>*Counsel*:<br>    Matthew Marshall Gurvitz<br>    VENABLE LLP | 2049 Century Park East<br>Suite 2300<br>Los Angeles, CA 90067 | 310-229-9900<br>mmgurvitz@venable.com |
| *Defendant:* Mohammad Diab<br>*Counsel*:<br>    Michael A. Thurman<br>    THURMAN LEGAL | 1055 E Colorado Blvd.<br>5th Floor<br>Pasadena, CA 91106 | 626-399-6205<br>michael@thurman-legal.com |
| *Lender:* Wells Fargo Bank, N.A.<br>*Counsel*:<br>    Duane M. Geck<br>    SEVERSON & WERSON APC | One Embarcadero Center<br>Suite 2600<br>San Francisco, CA 94111 | 415-398-3344 or<br>415-677-5506<br>dmg@severson.com |

- 20 -

EX PARTE MOTION TO CONFIRM SALE PROCEDURES

| Party and Counsel, If Applicable | Address | Telephone Number and Email Address |
|---|---|---|
| *Defendant:* Amy Roundtree<br>*Counsel*:<br>David P. Steiner<br>DAVID STEINER & ASSOC. | 1801 Century Park East, Suite 1600<br>Los Angeles, CA 90067 | 310-557-8422<br>Dpsartnetlaw@gmail.com |

This *ex parte* emergency application is made and based on this Motion, the memorandum of points and authorities, the declarations of Stephen J. Donell and Philip Seymour in support thereof, on the proposed order lodged concurrently, on the pleadings, records of files on the Court in this case, and on any supplemental evidence and arguments of counsel as may hereafter be presented in support of the application.

## VIII.  CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that this Court enter an Order:

(1) Approving the Receiver's proposed form and manner of notice to parties to the action and the public of the auction and opportunity for overbidding, including the Receiver's service of the Sale Notice, substantially in the form of Exhibit "1" to the Donell Declaration;

(2) Approving the Receiver's proposed Sale Procedures;

(3) Approving the proposed Stalking Horse Purchase Agreement attached to the Donell Declaration as Exhibit "2," subject to the overbidding at the auction to be conducted pursuant to the Sale Notice and Sale Procedures approved herein;

(4) Authorizing the Receiver to execute the FIRPTA Affidavit with the language set forth herein regarding the parties having satisfied the

- 21 -

EX PARTE MOTION TO CONFIRM SALE PROCEDURES

requirements to eliminate withholding tax under any California state or local law (or any comparable provision of U.S. federal law, including Section 1445 of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder) in connection with the sale under the Stalking Horse Purchase Agreement; and

(5)     Extending the deadline to close the receivership to March 31, 2020.

DATED: November 5, 2019          DIAMOND McCARTHY LLP

By:   /s/ *Kathy Bazoian Phelps*
Kathy Bazoian Phelps
*Counsel for Stephen J. Donell, Liquidating Receiver*

EX PARTE MOTION TO CONFIRM SALE PROCEDURES